## SHERWOOD *v.* ROUNDTREE.

*(Circuit Court, S. D. Georgia, W. D.* August, 1887.)

**1. USURY—WHAT IS—COMMISSIONS.**

R., having applied to D. & M., agents of the C. B. Co., for a loan of $2,000, was made to sign an application for a loan of $2,500. The application also contained a statement expressly constituting D & M. agents of R. in the transaction, and authorizing them to retain $500 as "commission." Subsequently, R. gave a note for $2,500 at 8 per cent., payable to S. at the office of the C. B. Co. R. only received $2,000; the other $500 being divided between D. & M. and the C. B. Co. *Held,* in a suit by S., that the retention of the $500 as commission was clearly usurious, under Code Ga. § 2057, forbidding any one to "reserve, charge, or take for any loan or advance of money * * * any rate of interest greater than eight per cent. per annum, either directly or indirectly, by way of commission for advances, discount, exchange, or by any contract or contrivance or device whatever."[1]

**2. SAME—AGENCY.**

The evidence showing that D. & M. were the regular agents of the C. B. Co., and that the latter received a portion of the usurious commission, the court will not suffer the statutes to be evaded by the fact that R. authorized D. & M. to act as her agents in the transaction.

**3. SAME.**

While authority to make a usurious loan will not be presumed where the agency is special, and limited to a single transaction, it will be presumed where the agency is general. *A fortiori* will it be presumed where it constitutes a great and comprehensive business, and where the courts have rendered decisions making manifest and public the nature of the business.

**4. SAME—NOTICE.**

The fact that S. was accustomed to lend money habitually through the agency of the C. B. Co. was sufficient to charge him with notice of the character of the contracts made by that firm or its agents.

**5. SAME.**

Where there is a regular business of lending money, with an elaborate system, one who lends money by such system will be chargeable with knowledge of all the facts which he could have learned by inquiry. The case of *Call* v. *Palmer,* 116 U. S. 98, 6 Sup. Ct. Rep. 301, distinguished.

**6. SAME—COURT AND JURY.**

When the commission retained for services in negotiating a loan is so large as to be usurious on its face, it is the duty of the court, in the absence of explanatory proof, to say so. It is not, in the federal courts, a question for the jury.

Suit on Promissory Note. Plea of usury. Motion for new trial.

*William E. Simmons* and *Duncan & Miller,* for plaintiff.

*A. C. Riley* and *Davis & Hardeman,* for defendant.

SPEER, J. The plaintiff brought suit to recover the face value of the following promissory note:

$2,500.                    FORT VALLEY, GA., December 28, 1883.

On the first day of December, 1888, I promise to pay to J. K. O. Sherwood, or order, at the office of the Corbin Banking Company, New York city, twenty-five hundred dollars, with interest from this date at the rate of 8 per cent. per annum, payable annually, as per five interest notes hereto attached, value

---

[1] Upon the question as to when a commission charged by an agent for negotiating a loan, in addition to the legal rate of interest, is usury, see Halderman v. Insurance Co., (Ind.) 11 N. E. Rep. 526; Mackey v. Winkler, (Minn.) 29 N. W. Rep. 337, and note.

received; and I hereby waive and renounce my right to the benefit of the exemption provided for by the constitution and laws of Georgia in all property I now have or may hereafter acquire, as against the payment of this note, and the interest notes hereto attached. Should any of said interest not be paid when due, it shall bear interest at the rate of eight per cent. per annum from maturity, as stipulated in said interest notes, and, upon failure to pay any of said interest within thirty days after due, said principal sum may, at the option of the holder of this note, be declared due without notice, and may thereupon be collected at once, time being of the essence of this contract; and, in case this note be collected by suit, I agree to pay all the costs of collection, including ten per cent. of the principal and interest as attorney's fees.

No. 34,342.                                    REBECCA A. ROUNDTREE.

Also the face value of the five coupons, as follows:

$208.33.                              FORT VALLEY, GA., December 28, 1883.

For value received, I promise to pay J. K. O. Sherwood, or order, at the office of the Corbin Banking Co., New York city, two hundred and eight dollars and thirty-three cents, on December 28, 1888, being interest to that date on my note given to said payee with interest from maturity at eight per cent. per annum.                                    REBECCA A. ROUNDTREE.

No. 34,342.

The remaining coupons are in the same form as that here printed, but are for different amounts, and are of different dates. Among other pleas, the defendant presents the plea of usury. She avers that Duncan & Miller, attorneys at law, were the agents of the plaintiff, and they withheld the sum of $500 at the time the loan was negotiated, this being 20 per cent. of the face value of the note; and while she executed the note for $2,500, in truth, her husband, for whom the money was borrowed, did not receive this amount, but the balance, after deducting 20 per cent., as above stated, was appropriated to pay her husband's debts, and she herself did not receive a dollar of the fund. The case was tried before a jury, and a verdict was rendered for the plaintiff, with 10 per cent. attorney's fees; the jury deducting from the plaintiff's demand all the excess of the interest over and above 8 per cent., which is the regular interest rate in Georgia. The plaintiff is dissatisfied with the verdict, and has made a motion for a new trial, and insists that certain instructions to the jury relative to the plea of usury were erroneous. There are other grounds of the motion, but as to them the court has no doubt or difficulty, and they are overruled.

On account of the great importance of the main question here involved, I embody in full that portion of the charge which relates to the plea of usury:

Now, what was the law of Georgia at the time of this contract? Code of Georgia, § 2050: "The legal rate of interest shall remain seven per cent. per annum, where the rate per cent. is not named in the contract, and any higher rate must be specified in writing, but in no event to exceed eight per cent. per annum." It, therefore, is illegal to charge more than eight per cent. per annum in this state where this contract was made. It has been, and is the policy of this state to render void usurious contracts, to the extent of the usury, it being thought by the law-making power of the state that such contracts are injurious to the best interests of the people. The law of the state

upon this subject is exceedingly stringent. Section 2057 of the Code of Georgia provides that "it shall not be lawful for any person, company, or corporation to reserve, charge, or take for any loan or advance of money, or forbearance to enforce the collection of any sum of money, any rate of interest greater than eight per cent. per annum, either directly or indirectly, by way of commission for advances, discount, exchange, or by any contract or contrivance or device whatever. (*b*) Any person, company, or corporation violating the provisions of the foregoing sections shall forfeit the excess of interest so charged or taken, or contracted to be reserved, charged, or taken. (*c*) The amount of forfeit as aforesaid may be pleaded as a set-off in any action for the recovery of the principal sum loaned or advanced by the defendant in said action. (*d*) No contrivance or arrangement between the parties to any such unlawful transactions, or their privies, shall have the effect to discharge such forfeiture, except it be an actual and full payment of the amount so forfeited. (*e*) All titles to property made as a part of a usurious contract, or to evade the laws against usury, are void."

You now understand the law, gentlemen, and I call your attention to the evidence of the witnesses, both for plaintiff and defendant, relating to this subject. Mr. Roundtree, the husband of the defendant, testified that Duncan & Miller, who were the agents with whom the contract of loan was made, retained $500 as commission, and that this was 20 per cent. of the amount borrowed. Mr. Duncan, one of the attorneys for the plaintiff, testifies that he, with his partner, were the agents of the Corbin Banking Company, from whom the money was directly received; that he don't know the plaintiff, Sherwood, at all. That Sherwood, he didn't think, had made more than ten or twelve loans of this character in Houston county. That most of the loans he and his firm had made went to the American Freehold Mortgage Company. He did not know how many, but thought the loans went to eight or ten different parties. He was questioned further, and I will read his evidence as reported by the stenographer: "*Question.* You represent the Corbin Banking Company as their agents? *Answer.* We represent the borrower. *Q.* Don't you also represent the Corbin Banking Company? *A.* They never paid us anything. *Q.* Didn't you say at the last court that you were the agents of the Corbin Banking Company? *A.* I said, in that way we send to them and negotiate. *Q.* The Corbin Banking Company are the agents of Sherwood? *A.* I don't know; my understanding is that they simply put these loans on the market. *Q.* Didn't I understand you, last court, to say that you were the agents, and that they were the agents for Sherwood? *A.* I don't know anything about that. I only know that we represent the borrowers, and we receive applications and send them on, but don't know where they go. *Q.* You didn't get the $500 commission for yourself? *A.* No, sir; we got only 5 per cent. *Q.* What became of the balance? *A.* I don't know. *Q.* You retain a commission of 20 per cent., and only 5 per cent. comes to you? *A.* Yes, sir; that is all. *Q.* And the other 15 per cent. is retained and sent to the Corbin Banking Company and to Sherwood? *A.* I don't know who it is retained by. *Q.* In addition to your services in making out the application and receiving the money, don't you always collect the interest and send it forward as it falls due? *A.* No, sir; sometimes a man comes in and gives us the interest, and we send it forward, but it is not our business, and we do it very seldom. *Q.* Ain't it your business to keep watch over the property, and see that it is not sold for taxes? *A.* No, sir; we don't watch anything. *Q.* You are under no such obligation as that to the Corbin Banking Company? *A.* No, sir. *Q.* You don't have to inform them when the property goes for taxes? *A.* No, sir; but they generally send out a list with a request that we mark all the taxes paid and those unpaid. They send a request each year, and we write a statement. We do that. *Q.* For that sort of work, do you get no

compensation from the lender? *A.* We are under no obligations to do it. *Q.* They call on you for that sort of services? *A.* Yes, sir; the Corbin Banking Company does. *Q.* Who do they represent? *A.* I don't know who they represent. *By the Court. Q.* Whom did you represent when you told Mrs. Roundtree that she could not get this money unless these executions were paid? *A.* We represented her. *Q.* In whose interest was it that you told her that she could not get this money, unless these executions were paid? *A.* It was in the interest of the Corbin Banking Company. *Q.* To that extent, then, you were the agents of the Corbin Banking Company? *A.* Yes, sir; to that extent, to see that the title was all right. We are required to send on an abstract showing the title. *Q.* You have a regular correspondence with the Corbin Banking Company? *A.* Yes, sir. *Q.* Receive instructions from them as to the matters you attended to for them? *A.* Yes, sir. *Q* And while you claim to be the agents of the borrower, and the contract recites that you are the agent of the borrower, nevertheless, if it were not for the power the Corbin Banking Company puts in your hands there would be no money for the borrower? *A.* We might send the application to other companies. *Q.* In point of fact you are really the agents of the lenders of the money, looking after their interest, and examining the titles of the borrowers to see if they are all right. Don't you know, as a lawyer, that you do render the services of an agent to this Corbin Banking Company? *A.* Certainly, to the extent of seeing that the titles are perfect and in due form. *Q.* Would not you feel, in making transactions of this sort, that you must protect the interest of the Corbin Banking Company? *A.* I would feel that we must send in a correct statement. As a matter of course we ought not to do anything to injure them, and we ought to protect them. *Q.* And you do not feel, therefore, that you were simply their agents as an attorney is for a client? *A.* No, sir. *Q.* You insist, then, that you are the agent of both parties? *A.* I just state the facts as to what we do; we have no authority except to do what I have stated. They would not be bound by anything we should do. We simply send forward the papers, and sometimes they reject them, sometimes they reduce the amount, and sometimes they allow the loan."

Mr. Miller, another member of the firm of Duncan & Miller, and an attorney for the plaintiff, testifies on this subject: "*Question.* In representing these loans it is your usual rule to charge 20 per cent. and you retain only 5 per cent. for your services? *Answer.* The rule has varied somewhat about that. The rate of commission has varied; it has steadily fallen off. At the time this loan was made I think it was 20 per cent. *Q.* You had a good many of these transactions, and that was the invariable rule up to that time, and since that time it has been the invariable rule to take out considerable sums, of which you get a portion? *A.* At one time Nelson & Barker had the general business, and we were subagents, and the portion that reached us was small; and afterwards, when Robinson was the agent, dealing with the banking company, until we established a direct agency between us and the Corbin Banking Company,—then they got 15 per cent. and we got 5 per cent. *Q.* The Corbin Banking Company gets part of this commission? *A.* We do not know anybody but the Corbin Banking Company in this transaction. *Q.* You don't get all this commission? *A.* No, sir; so far as I know, the Corbin Banking Company divides the commission; and, taking the commission at 20 per cent. the Corbin Banking Company gets 15 per cent., and we get 5 per cent. And at a commission of 15 per cent., which is the rate now, the Corbin Banking Company gets 10 per cent., and we get 5 per cent. *Q.* The Corbin Banking Company represents Sherwood in making a good many loans in Houston county? *A.* I don't know what the connection is between the Corbin Banking Company and Sherwood, but occasionally Sherwood's name appears as the lender, and sometimes the American Mortgage Company, and sometimes oth-

ers. *Q.* Sherwood, a good many times made the loan to the Corbin Banking Company; there were a number before this loan was made, and a number since? *A.* Yes, sir; unquestionably."

From this evidence it is apparent, gentlemen, that a sum largely in excess of the legal rate of interest was held back by the lender or his agent from the borrower. Now, where the agent who is authorized by his principal to lend money for the lawful rate of interest, exacts for his own benefit more than the lawful rate of interest, and does so without the authority of the principal lender, or without his knowledge, the loan is not thereby rendered usurious. Where, however, the agent is authorized to loan the money for usurious interest, or where the lender, that is the principal, had knowledge that the loan was usurious, then the contract is in violation of law, and, in a suit on an instrument like this, the plaintiff can only recover the legal rate of interest. This loan would unquestionably have been usurious if made by the principal lender. It is usurious if made by his agent with his consent, knowledge, or acquiescence. I charge you, further, that if the circumstances are such, either from the number of the transactions, the importance of the amounts involved, or the continuous nature of the business carried on through the same agency, that, from one or all of these reasons, it is reasonably inferable that the principal lender knew the character of the contracts his agents were making, he will be chargeable with knowledge of the usurious interest and the usurious character of the contract, the law presuming that he would not carry on a business of a continuous and important character without understanding the nature of the contracts made by his agents in its conduct. To summarize what I have said upon this subject: If these usurious commissions were retained by the agents for their own benefit, without the knowledge, consent, or acquiescence of the principal, the principal lender would not be affected by the usurious nature of the transaction, and he would be entitled to recover without deduction on account of usury. If, on the other hand, these contracts were made and these commissions were withheld with his consent, knowledge, or acquiescence, he would be chargeable with the usurious character of the transaction, and he could not recover any sum in excess of the legal rate of interest. which, in this state, is eight per cent. And furthermore, if from the nature of the business, its extent, the importance of the amounts involved, the continuous character of the transactions, it would be reasonably inferable that a man of business of ordinary intelligence, carrying on such a business, would understand the nature of the contracts that his agents were making, he would be presumed to understand the nature of the contracts, and, therefore, the presumption that he is chargeable with the usurious interest, and with its consequences, in lessening the amount of his demands, would obtain; and in the absence of proof on his part to rebut such knowledge, acquiescence, or consent, the jury would be obliged by their verdict to deduct all sums of the plaintiff's demand over and above the amount actually paid to the defendant, with the legal rate of interest calculated thereon.

From the evidence contained in this portion of the charge of the court, it is plain that there is an extensive business carried on in the state of Georgia, to which the plaintiff was party, by which it is the unvarying custom to charge inordinate and extravagant rates of interest. In this case the note sued on bore 8 per cent. per annum, the highest legal interest permissible. The plaintiff's agents withheld 20 per cent. in the outset. Thus, 28 per cent. is imposed on the necessities of the borrower; in addition, 10 per cent. attorney's fees are charged. It is superfluous to say that no business, howsoever prosperous, can survive the exactions of these fearful and unconscionable interest charges. To correctly ap-

preciate the enormous extent of these transactions, we have but to turn to the docket of this court alone, where we find that there are pending and have been disposed of in one division of this district 51 cases upon contracts of this precise character, involving $211,062.13, and mortgaging and conveying 66,911 acres of land. The plaintiff in this case, J. K. O. Sherwood, according to the testimony of Mr. Duncan, made 10 or 12 loans of this character in one county, the county where Mrs. Roundtree lived. The *modus operandi* by which the loan was negotiated is as follows: The necessitous learn that the subagency has money to lend upon farms. Application is made, and the first thing done is to present to the borrower a printed form, with which the subagents are supplied, requiring the applicant to constitute the subagents his or her agents. The form of agreement in the record has printed on it, "South Form No. 2." It stipulates:

"I hereby constitute you my agent, and request and authorize you as such to negotiate for me a loan of $2,500 on five years' time, with interest at 8 per cent. per annum, payable annually at such place as you may name. Said loan to be evidenced by my note of the form used by you, and said note and loan to be secured by mortgage on, or an absolute deed (consented to by my wife) to my farm consisting of 607¼ acres situated about six miles of the town of Perry, in Houston county, Georgia."

Among other stipulations, the agreement contains this:

"I further agree to pay you for negotiating said loan a commission of $500, to be paid at the time of closing the loan, and, if I decline to accept the loan for any reason, I agree to pay said commission at once. I also authorize you to pay off all liens, including taxes due against said property, and I hereby certify that the total amount of indebtedness against the said property does not exceed ——— dollars. I hereby authorize you to insure said property for ——— dollars for ——— years, in such company as you may select, to pay the premium out of the loan," etc.

The application is also written on a printed blank, viz., on "South Form No. 1." This is also careful to state that the agent is agent of the applicant, Mrs. Roundtree. This agent, who is designated on form No. 1 by the Corbin Banking Company as their "correspondent," forwards the application. If the loan is accepted, a draft is sent by the Corbin Banking Company. The agent withdraws 20 per cent., 5 per cent. he retains for himself, and the 15 per cent. he remits to the Corbin Banking Company. The borrower executes a note for the full amount of the loan, but one-fifth of the amount in this case was never paid to him. Now, it will be observed from the agreement quoted above that Mrs. Roundtree promises to pay the subagent, who in this case was one John W. Robinson, the predecessor of Duncan & Miller, $500 for his services in negotiating the loan. Nothing was said in the agreement to notify her that 15 per cent. or $375 would go to the Corbin Banking Company, and yet this was true, and Duncan & Miller testify that it is invariably true. To use Miller's language, "the Corbin Banking Co. gets 15 per cent.; we get 5 per cent.; and at a commission of 15 per cent., which is the rate now, the Corbin Banking Co. gets 10 per cent., and we get 5 per cent." This witness is asked this question: "The Corbin Banking Co. represents

Sherwood in making a good many loans in Houston county?" He answered: "I don't know what the connection is between the Corbin Banking Co. and Sherwood, but occasionally Sherwood's name appears as the lender, and sometimes the American Freehold Mortgage Co., sometimes others." "*Question.* Sherwood, a good many times, made the loan,—a number before and a number since? *Answer.* Yes, sir; unquestionably." Now, it will be perfectly manifest to the intelligent mind that this gigantic business, carried on in the manner pointed out, has for its largest profits the exorbitant charges of 15 and 20 per cent., so-called commissions, which are exacted from the necessities of the borrower in plain violation of the law, but with the artful and specious device whereby the borrower is had to sign a paper stating that the person who negotiates the loan is his agent, when it is perfectly evident that he is the agent of the money lender. The relation of principal and agent arises whenever one person, expressly or by implication, authorizes another to act for him, or subsequently ratifies the acts of another in his behalf. Code Ga. § 2178; *Cheney* v. *Woodruff*, 6 Neb. 151; *Cheney* v. *Eberhardt*, 8 Neb. 423, 1 N. W. Rep. 197; *Security Co.* v. *Addison*, 15 Neb. 336, 18 N. W. Rep. 76,—a case precisely in point; *Matteson* v. *Blackmer*, 46 Mich. 393, 9 N. W. Rep. 445; *Wilcox* v. *Chicago, etc., Railroad Co.*, 24 Minn. 269; *Milligan* v. *Davis*, 49 Iowa, 126; *Reynolds* v. *Collins*, 78 Ala. 94; *Bouch* v. *Wilson*, 59 Ind. 93; *Payne* v. *Newcomb*, 100 Ill. 611.

Duncan & Miller, no doubt, had heard the application of the borrower, but their business in this connection was that of loan agents, and for a particular company, and for certain individuals; and they represent the lenders in placing the loan, examining the titles, releasing the property from liens, insuring the property, and paying the taxes. It was their regular business to invest safely the money of the lender, and thereafter protect the investment. They are now seeking to collect the money, and it appears that all their actions in the premises have been ratified by the lender. They were the agents of the plaintiff; and this is manifest notwithstanding the sedulous attempt to make it appear that they were the agents of the defendant. The fact is, this attempt is strongly indicative of the illegal character of this business. The *quo animo* of the parties is of the first importance. Is it not perfectly evident that this entire scheme is a device or shift to dodge the usury laws of the state of Georgia? If not, why so careful to state that the subagent and correspondent of the Corbin Banking Company is the agent of the borrower? Look at the testimony of Duncan, one of the subagents, who is likewise the attorney of the plaintiff: "*Question.* Who represent the Corbin Banking Company as their agents? *Answer.* We represent the *borrower.* Q. Don't you also represent the Corbin Banking Company? *A.* They never paid us anything. *Q.* Didn't you say at the last court that you were the agents of the Corbin Banking Company? *A.* I said, in that way we send to them and negotiate." Again: "You didn't get the $500 commission for yourself? *Answer.* No, sir; we got only 5 per cent. *Question.* What became of the balance? *A.* I don't know." Again: "You have a regular correspondence with the Corbin Banking Company? *An-*

*swer.* Yes, sir. *Question.* Receive instructions from them as to the matters you attend to for them? *A.* Yes, sir."

It is true that there must be an intention knowingly to contract for or to take usurious interest, for if neither party intend it, but act *bona fide* and innocently, the law will not infer a corrupt agreement. Where, indeed, the contract upon its very face imports usury, *res ipsa loquitur*, the thing speaks for itself. This distinction was laid down as early as the case of *Button* v. *Downham*, 2 Cro. Eliz. 643; *Bedingfield* v. *Ashley*, Id. 741; *Roberts* v. *Trenayne*, 3 Cro. Jac. 507. The same doctrine has been acted upon in modern times, as in *Murray* v. *Harding*, 2 W. Bl. 859, where GOULD, J., said that the ground and foundation of all usurious contracts is the corrupt agreement. *Floyer* v. *Edwards*, Cowp. 112; *Hammet* v. *Yea*, 1 Bos. & P. 144; *Doe* v. *Gooch*, 3 Barn. & Ald. 664; and *Solarte* v. *Melville*, 7 Barn. & C. 431. *Vide* opinion of Mr. Justice STORY in *Bank* v. *Waggener*, 9 Pet. 399.

Now, the agreement by which Mrs. Roundtree promised to pay 20 per cent., in addition to the 8 per cent. per annum interest, to pay all premiums of insurance, all taxes, and to pay off all liens, is part of the plaintiff's case; it is an essential part of the contract, and was put in evidence by the plaintiff. Unquestionably it is the rankest usury. It is not disputed that one who negotiates a loan may be allowed reasonable compensation for his expenses and trouble, in addition to interest. But where there is no expense, and no trouble, there cannot properly be charged any such remuneration. Tyler, Usury, 335. And no decision can be found where a court of justice has sustained a charge of 20 per cent., where any knowledge of such charge was traceable to the money lender. But here is 20 per cent. in addition to 8 per cent. per annum. Indeed, Lord TENTERDEN, in *Meagoe* v. *Simmons*, 1 Moody & M. 125, held that, where the lender stipulates with the borrower that the latter shall pay a commission to the lender's agent, it is usurious, although the lender himself retains nothing but the legal discount. This, Mr. Tyler says, is a well-considered case. The truth is, the enormous commissions charged are merely intended as a mask thrown over the transaction. The statute of Georgia quoted above is intended to defeat schemes of this character, and a fraud upon a statute is a violation of the statute. *Bank of U. S.* v. *Owens*, 2 Pet. 527. The services rendered in the negotiation of this loan, had they been rendered the defendant, when in fact they were not, would not have been worth at the most more than a tenth of the sum charged. Nor is this, under the circumstances, a question for the jury. It is usurious on its face; and, in the absence of explanatory proof, it was the duty of the court to say so. *Steele* v. *Whipple*, 21 Wend. 103. This is especially true, as a matter of practice, in a court of the United States. *Hathaway* v. *East Tennessee, V. & G. R. R.*, 29 Fed. Rep. 489.

The plaintiff relies with great apparent confidence upon the case of *Call* v. *Palmer*, 116 U. S. 98, 6 Sup. Ct. Rep. 301. There Burnham had $10,000 belonging to a relation, Mrs. Davidson. Call applied in writing for a loan; and Burnham, thinking Call's proposition a favorable one, decided to accept it for Mrs. Davidson, and afterwards sent

the money to Emmettsburgh, to a firm of bankers, of which he was a member, for Call. The bankers, Burnham, Ormsby & Co., took Call's note for $10,000, with 10 per cent. interest, which Call secured by mortgage. They paid him only $8,000, retaining $2,000 as compensation for their services in negotiating the loan. No part of this sum was paid to Mrs. Davidson. She did not know that it had been deducted; and she never authorized Burnham, or Burnham, Ormsby & Co., to loan her money at greater rate of interest than 10 per cent., or to retain any commission or bonus out of the sum lent. In short, she received no benefit, nor had any knowledge of the usurious charge. This appeared from the proof, and it was manifestly to be held, and was held, not usurious as to her or her assignees. In rendering the decision, Mr. Justice Woods uses language which is quite significative of the rights of the parties here, had this not been true.

It will be observed that in the case of *Call* v. *Palmer* there was but a single transaction. Here there is a continuous and settled business, with an elaborate system, with printed forms, classified with reference to the different sections of the country, correspondents, and subcorrespondents, and printed instructions to correspondents, with usually a charge of 20 and always a minimum charge of 15 per cent. above the rate of interest allowed by the laws of the land. Under such circumstances, one who lends money by this system will be chargeable with knowledge of all the facts which he could have ascertained by inquiry. It appears from the evidence that Sherwood made many loans within the confines of one county, and certainly it is presumable that he knew the terms upon which, under these circumstances, his money was loaned. This has been expressly held by the supreme court of Connecticut, a tribunal whose judgments are entitled to high consideration, in the case of *Rogers* v. *Buckingham*, 33 Conn. 81. The doctrine is there announced in these words: "Authority to make a usurious loan will not be presumed where the agency is special, and limited to a single transaction. It may be presumed where the agency is general, and embraces the business of making, managing, and collecting the loans of a moneyed man." *A fortiori* will it be presumed where it constitutes a great and comprehensive business, covering entire states, and especially where the courts have rendered decisions making public and evident the nature of the business carried on by the Corbin Banking Company through which all the loans are placed? *Vide New England Mortgage Security Co.* v. *Addison*, 15 Neb. 336, 18 N. W. Rep. 76. The action of this loan agency, in withholding 20 and 15 per cent. commissions, is a matter of public notoriety. It will be presumed that they had authority to do as they did. It will be inferred from the general manner in which they have been allowed to proceed for a period sufficiently long to establish a settled course of business. *Martin* v. *Webb*, 110 U. S. 14, 3 Sup. Ct. Rep. 428; *Merchants' Bank* v. *State Bank*, 10 Wall. 604. If it were not true, however, that the plaintiff was engaged in the business of a usurer, certainly the circumstances were such as would put a man of ordinary business intelligence, lending his money by this system, on inquiry. Let us suppose that the first loan was legitimate so far as

Sherwood, the plaintiff, was concerned. The Corbin Banking Company continues to take his money to lend in a remote state. Presumably he expects the return of his principal with 8 per cent. interest. He lends to many persons through the same agency. Ought he not to inquire the terms of the contracts upon which his money is loaned? A man of ordinary business intelligence is presumed to know the character of the contracts made with his money. He should have inquired what was the compensation of the Corbin Banking Company. Lending money as a business, he should have known the amount of the commissions that his agents charged. He cannot shut his eyes and ears to the nature of these transactions, and thus empower others to carry on a stupendous business, in violation of law, with his money, without sharing the responsibility for their conduct. This being true, he is chargeable with notice of all that he would have found out on inquiry; and, certainly, there would be no want of witnesses to satisfy him that the agents were violating the law. In *Call* v. *Palmer, supra,* it was clear that the principal lender knew nothing about the usury. And so in *Boardman* v. *Taylor,* 66 Ga. 648. In the last case, Chief Justice JACKSON used this language: "The payment of the money to Plant and Son to negotiate the loan, which money Taylor never got, and of which he knew nothing, cannot convict him of usury, or taint the loan he made with the leprosy of usurious interest."

In the presence of the presumption which arises from the settled character of this business, and the facts which should put the plaintiff on inquiry, having shown the usury, the defendant may rest his case; and the plaintiff is then called upon to show that he did not know, or authorize, or consent to these usurious charges; otherwise the defendant is entitled to a deduction therefor. *Maine Bank* v. *Butts,* 9 Mass. 55; *Roberts* v. *Trenayne,* 3 Cro. Jac. 508; *Childers* v. *Deane,* 4 Rand. (Va.) 406; *New York Fireman's Ins. Co.* v. *Sturges,* 2 Cow. 676. The evidence of the plaintiff is strangely silent upon this damaging accusation. Certainly, if he is not connected with the usurious transactions, it is competent for him to show it. The effect of the evidence of the plaintiff was to withhold from the court and jury the identity of the person or persons by whom the 15 per cent. was appropriated, after Duncan & Miller were paid 5 per cent. This does not commend the plaintiff's case to the court. I repeat this is clearly a device to avoid the law of Georgia. In *Bank* v. *Owens,* 2 Pet. 527, Mr. Justice JOHNSON, upon a question of this character, said: "Courts of justice cannot be made the handmaids of iniquity. Courts are instituted to carry into effect the laws of the country. How can they, then, become auxiliary to the consummation of violations of the law?" The usury laws are made for the protection of the needy; and, in the language of Mr. Justice FIELD, in *Cromwell* v. *Sac Co.,* 96 U. S. 60, "courts will look with disfavor upon the devouring character of the interest stipulated." In that case it was far smaller than that stipulated in this case. Chief Justice TANEY, in *Brewster* v. *Wakefield,* 22 How. 118, declares: "Where the party desires to exact from the necessities of the borrower more than three times as much as the legislature deems reasonable and just, he must take care that the con-

tract is so written in plain and unambiguous terms, for with such a claim he must stand upon his bond." Chief Justice Best, in the house of lords, declared that the policy of all usury laws in modern times is to protect necessity against avarice, and to fix such a rate of interest as will enable industry to employ with advantage a borrowed capital, and thereby to promote labor and national wealth.    3 Bing. 193.

It would be difficult to devise contracts which, in their operation and effect, would more completely defeat the object of the usury laws than the contract now before the court.    In its inception 20 per cent. of the entire capital is withdrawn.    In addition to this, he must pay 8 per cent. on a sum he never received, as regular interest.    No amount of industry in ordinary and legitimate business can compensate the borrower for so great a deduction.    This is especially true of those engaged in the pursuits of agriculture.    The courts, ordinarily, have nothing to do with the results of the contracts which people make; but the direful effects of such contracts, as that upon which the plaintiff has brought his action, well illustrates the wisdom of the laws of Georgia upon this subject. Many families, who otherwise would have enjoyed all the comforts of home and adequate support, have been turned out homeless and landless.    The head of the family has been induced by the hope of speculative gain to enter into contracts to pay these exorbitant and extravagant rates of interest for the use of money.    Not only does he find that the product of his farm is insufficient to pay the principal, but he cannot support his family and pay the interest coupons as they fall due.    It is then optional with the creditor to foreclose his mortgage, or to sue his notes for the entire amount.    The judgment of foreclosure is obtained; the sheriff or the marshal brings the land of the debtor to the block; and a family, with all its productive capacity to the state, and all of its contentment and happiness within its own circle, is destroyed and scattered.    The money lender is compelled to purchase the farm which he obtains for a mere moiety of its value.    Unacquainted with the conditions of our climate, the character of our soil, and the methods of our agriculture, he is unable to cultivate his acquisition in a manner profitable to himself, or beneficial to the state.    Persisted in, this monstrous system would reduce the agricultural population of the state to the condition of a landless tenantry, with all of the degradation of manhood, and all the wretchedness and pauperism, this is known to entail.

In every possible view, therefore, the system is absolutely ruinous, and well has the experience of those who have observed the effect of this business justified the declaration of Mr. Justice Johnson, in *De Wolf* v. *Johnson,* 10 Wheat. 385, where he declares that "usury is a moral taint wherever it exists."    He continues: "No subterfuge shall be permitted to conceal it from the eye of the law."    This is the substance of all the cases, and they only vary as they follow the *detours* through which they had to pursue the money lender.

Nor is this experience confined to our own state, or our own times. In an important case in the court of errors of the state of New York, involving the question of usury, the illustrious Chancellor Kent has given

to us certain facts of history with relation to usury laws in general. "If we look back upon history," said he, "we shall find that there is scarcely any people, ancient or modern, that have not had usury laws. The Romans through the greatest part of their history had the deepest abhorrence of usury. It will be deemed a little singular that the same voice against usury should have been raised in the laws of China, in the Hindu institutes of Menu, in the Koran of Mahomet, and perhaps, we may say, in the laws of all nations that we know of, whether Greek or barbarian." "In England, usury was an object of hatred and legal animadversion, at least as early as the time of Alfred." The statute of 37 Hen. VIII., c. 9, not only made usury illegal, declared that the usurer should forfeit for every offense the total value of the money or thing forborne, but that he should suffer imprisonment, and that one moiety of the forfeiture should go to the king, and the other to the prosecutor. And while the British people at this time have free trade in money, as in everything else, the American states have, almost without exception, adopted laws prohibiting an unreasonable rate of interest. Here, at least, the utterances of Lord REDESDALE are applicable, when he said: "The statute of usury is interposing its warning voice between the creditor and the debtor, even in their most secret and dangerous negotiations, and teaches a lesson of moderation to the one, and offers its protecting arm to the other."

In this case the plaintiff must be content, so far as the action of this court is concerned, with his principal actually paid to the defendant and 8 per cent. interest thereon, with attorney's fees. The verdict by which he has been deprived of the 20 per cent. so-called commissions, included in the face of the note, but never received by defendant, is sustained, and the motion for a new trial is overruled.