435 P.2d 83

Robert K. ALTHERR and Pauline Lawanda Altherr, Appellants,

v.

**WILSHIRE MORTGAGE CORPORATION,** Appellee.

No. 1 CA–CIV 363.

Court of Appeals of Arizona.

Division 1.

Dec. 13, 1967.

Leibsohn & Goldstein, by, Philip T. Goldstein, Phoenix, for appellants.

Hughes, Hughes & Conlan, by, Coit I. Hughes, Phoenix, for appellee.

CAMERON, Chief Judge.

This is an appeal from a judgment foreclosing a mortgage in favor of the plaintiff Wilshire Mortgage Corporation and against the defendants Robert K. and Pauline Altherr, husband and wife. The defendants raised the affirmative defense of usury, § 44–1202 A.R.S., which specifies a maximum legal interest rate of eight percent per annum.

The trial court made findings of fact and conclusions of law, and granted judg-

ment in favor of the plaintiff in the amount of $85,273.08 plus costs and attorney's fees in the amount of $7,500.00.

We are called upon to determine whether certain charges made by the plaintiff and agreed to by defendants are interest (and therefore usurious) as defendants claim, or service charges and brokerage fees (and therefore not usurious) as the plaintiff contends. Should we find that the charges were usurious, we must also determine whether there was a valid tender after suit but prior to the trial of the matter.

The facts necessary for a determination of this matter on appeal are as follows. Defendant Robert K. Altherr was in the construction business and desired to obtain interim and permanent financing for home construction on 104 lots in Maricopa County known as Paradise Gardens Unit 3. The plaintiff and defendants had entered into previous arrangements concerning the financing of Unit 1 and Unit 2 of the said Paradise Gardens tract. An agreement was executed for "construction and long-term financing" dated 16 February 1960 wherein defendants were designated as the sellers and Wilshire Mortgage Corporation, the plaintiff, was designated as Wilshire, containing the following provisions:

"Pursuant to Seller's request, Wilshire will arrange the financing covering the 104 lots in the above-captioned tract on a 'package' basis at the total cost to the Sellers of 6½% of each loan. The 'package' shall consist of 1½% for interim financing and 5% discount on the 'takeout'.

\* \* \* \* \* \*

"3. Wilshire will act as originating lender on all sales made subject to F.H.A. loans.

\* \* \* \* \* \*

"5. Wilshire will charge to and collect from each purchaser-mortgagor and/or the builder-seller a sum equal to 1% of the F.H.A. loan for its services in processing said loan.

\* \* \* \* \* \*

"13. Sellers hereby agree that, upon demand of Wilshire, they will deposit with Wilshire 1% of the total amount of loans covered by this contract. Said 1% to be ratably refunded as each loan is closed in Escrow, and in the event any parcel under this contract is not sold, subject to F.H.A. Section 203B, then Wilshire is authorized to withhold 1% of that loan from this deposit.

(a) Payment of the deposit mentioned in paragraph 13 may be made by either a cash deposit or in the form of a demand note; however, the exact method of payment shall remain Wilshire's sole prerogative."

The contract also provided that Wilshire should place and handle all the fire insurance, and that the contract should expire in 12 months. At the same time this contract was executed defendants also executed a promissory note in the amount of $17,455.00 payable 60 days from date. A construction loan agreement and "assignment of account" entered into the 19th of February 1960 recited:

"This agreement is executed for the purpose of obtaining a building loan from Wilshire Mortgage Corporation (herein termed Lender), and as part of the loan transaction, the loan to be evidenced by 104 notes of the undersigned totaling $1,745,500.00,"

and providing that $1,486,750.00 was to be disbursed as for construction. The evidence and the testimony indicates that it was contemplated that the permanent construction money to be available would be in the amount of $1,745,500.00, and that the total available as interim construction would be $1,457,600.00. Plaintiff in its brief states as follows:

"As will be seen, the Plaintiff's charge for securing interim financing was one and one-half (1½%) per cent. The interim financing secured by the Plaintiff totaled one million four hundred and fifty-seven thousand six hundred ($1,-457,600) dollars, one and one-half (1½%) per cent of which totals twenty-one

thousand eight hundred and sixty-four ($21,864.00) dollars. In addition, in accordance with Paragraph 13 of the agreement between the parties (Exhibit 10), the Defendants were to deposit with the Plaintiff one (1%) per cent of the amount of monies secured for permanent financing which was to be ratably refunded to them as the permanent loans on homes built by the Defendants and which were made subject to FHA Section 203(b) were closed in escrow. The one (1%) per cent to be deposited by the Defendants was, in fact, represented by the note for seventeen thousand four hundred and fifty-five ($17,455.00) originally executed by them * * *"

The testimony indicates that the defendants were charged by Wilshire with total construction draws of $582,028.49, but that the defendants actually received the amount of $542,709.49. The difference between the amount charged and the amount received, $39,319.00, was withheld by the plaintiff out of defendants' construction draws in order to satisfy $21,864.00 representing the 1½% which the defendants agreed to pay for interim construction, and the amount of $17,455.00 being the amount of the note representing the 1% discount or interest charge in advance for the permanent mortgage financing. The testimony also shows that the plaintiff advanced the sum of $490,370.00 to the defendants as and for permanent financing so that the two larger amounts contemplated by the agreement were never in fact advanced to the defendants. Plaintiff contends that the money was available for them and that the 1% and 1½% were merely fees for the obtaining and holding in readiness or reserve this money for the use of the defendants. These sums do not reflect the 1% service charge as provided in paragraph 5 of the agreement. In addition to these charges, the construction loan agreement and "assignment of account" provided that defendants were:

"3. To pay Lender interest on the sums, disbursed from the Account at the rate of 6½% per annum, from the date of the respective disbursement to the date interest starts on the note. * * *"

The defendants did not complete the subdivision, and in January of 1963 signed a note and mortgage payable to the plaintiff in the amount of $89,000.00 plus interest at the rate of 6½%. Defendants also signed a mortgage for the same amount on that day for the property that they possessed which provided:

"In the event that any payment or portion thereof is not paid within 15 days from the date the same is due, Mortgagor agrees to pay a late charge of 2% for each dollar so overdue, if charged by the Mortgagee."

Some of the homes were sold, and by January 1963 under the terms of the note there was an amount claimed due and owing by the plaintiff of $77,904.00, together with interest from 3 February 1964. Plaintiff brought suit for this amount, and the defendants thereafter tendered to Wilshire Mortgage a cashier's check in the amount of $79,000.00. Said check was tendered on 17 April 1964 and covered the amount claimed by the plaintiff, together with interest and costs, but it did not cover the amount of attorney's fees demanded. The tender was rejected and the defendants filed an answer asserting usury, together with a counterclaim requesting a judgment in the amount of all interest charged.

Since the sums advanced by Wilshire earned interest at the rate of 6½% per annum it is apparent that if the two amounts of 1½% of $1,486,750.00 and 1% of $1,745,500.00 are found to be interest for the use of the money received from Wilshire, the total interest claimed is clearly usurious under our statute. On the other hand, if these two amounts are found to be merely fees to be paid to Wilshire as a broker or agent of the lender for obtaining funds in readiness and use by the defendant, then it is a separate fee and not interest, and the defense of usury fails and Wilshire may prevail.

■ The courts have been careful to look behind any agreement wherein usury is plead, and particularly in this type of situation. For example:

"It is immaterial how or in what manner or form the lender of money cloaks a usurious charge for its use or detention, if the result is that such lender, by such means, exacts more than the maximum rate of interest, the contract is vitiated with the taint of usury. The lender may style the excessive interest as a bonus or a commission given to him as agent, but if he is in fact the lender of the money, and hence acting for himself and not for another, and receives the bonus or commission for the lending of his own money, the law denominates such 'bonus' or 'commission' as 'additional interest'." Deming Inv. Co. v. Giddens, (Tex.Civ. App.) 41 S.W.2d 260, 262 (1931).

Our Supreme Court has discussed the matter at length:

"A lender, in addition to the highest rate of interest, may charge the borrower reasonable fees for services rendered in connection with the loan, or require reimbursement of expenses incurred, such as the examination of title, recordation of papers, and perhaps traveling expenses and other similar expenses. (citations omitted) But such charges must be limited to specific services rendered and expenses incurred, and may not be made a device through which additional interest or profit on the loan may be exacted. (citations omitted) Nor may a lender charge to a borrower the ordinary overhead expenses of his business: (citations omitted)

"While it is possible that the appellant Grady could have charged the appellees for some of the expenses he incurred in connection with the loans if such charges had been specific and in reasonable amount, we cannot approve a provision by which the lender adds a set percentage of the amount loaned as a blanket fee to cover indefinite expenses, some of which are certainly part of the normal overhead of the lending business, where that fee plus the rate of interest exacted exceeds the maximum rate of return permitted by the statute. To do so would open an easy avenue for avoidance of the usury penalties.

"Appellants argue that appellees failed to prove their intent to violate the usury statute. It is not necessary to show that the appellants were conscious of the illegality of the transaction. 'It is sufficient [to show] that the loan contract unequivocally calls for an excessive rate of return on the indebtedness. In such case, the intent to exact usury is presumed.' (citations omitted) The portion of the agreement quoted above, as applied to a situation where the appellant is lending his own money, unequivocally calls for a rate of return greater than the 8% per annum permitted by law, and appellants' unsuccessful attempt to justify the 3% 'brokerage' charge has failed to rebut the presumption of intent arising therefrom." Grady v. Price, 94 Ariz. 252, 256, 257, 383 P.2d 173 (1963).

The courts generally follow the rule that where a lender:

" * * * pretends to act as agent, broker, or like intermediary, and exacts from the borrower a commission or brokerage fee, in excess of the legal rate of interest, for his supposed service in negotiating the loan, the transaction will be declared usurious upon proof of its deceptive character even though the lender had in fact procured the money for the loan from a third party and incurred some trouble or expense in doing so." § 6, 91 A.L.R.2d 1400.

And it has even been held that one who makes loans in his own name can be chargeable with usury even though he did not loan his own funds. 52 A.L.R.2d 767; Dodson v. Peck, Tex.Civ.App., 75 S.W.2d 461 (1934).

■ The defense of usury allows the court to look behind the written documents to determine if usury in fact exists, Small v. Ellis, 90 Ariz. 194, 367 P.2d 234 (1961),

which the trial court did in this matter. The trial court in its findings of fact and conclusions of law made the following findings:

"Finding 3. That at the request of the defendants, the plaintiff was to arrange financing for construction and improvements on the said lots on a package basis to a total cost to the defendants of 6½% on each lot. This 'package' was to consist of 1½% for interim financing and 5% discount on the take out; * * *

"Finding 4. The plaintiff, as agent for the defendants, secured interim and permanent financing in the sum of $1,457,-600.00 and $1,745,550.00 respectively * * *"

Findings of fact and conclusions of law made by the trial court will not be disturbed on appeal unless clearly erroneous. Brand v. Elledge, 101 Ariz. 352, 419 P.2d 531 (1966). The trial court in the instant case could go behind the written documents in determining if usurious interest had been received by plaintiff, Small v. Ellis, supra, but the trial court may not ignore the written documents in making its decision, and even when viewing the evidence in a light most favorable to the trial court's determination, we feel the defendants have shown a clear case of usury. The evidence indicates that the plaintiff was not acting merely as a broker or servicing agency in obtaining finances but was the lender of the funds itself as the written documents state. Whether Wilshire used its own money or obtained the money from other sources is immaterial. Wilshire signed the agreement, made the loan, took the mortgages, collected the money, and brought suit all in its own name. Under these circumstances the additional charges were interest, and defendants should have prevailed in the counterclaim. Our statutes are clear that if usurious interest is charged the one receiving such usurious interest loses all right not only to the excess interest but all interest as well:

"No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater sum or any greater value for the loan or forbearance of any money, goods, or things in action, than eight dollars on one hundred dollars for one year. Any person, contracting for, reserving or receiving, directly or indirectly, any greater sum of value, shall forfeit all interest." § 44-1202 A.R.S.

The trial court in finding for Wilshire Mortgage did not have to determine if there was a valid or timely tender when defendants presented the cashier's check in the amount of $79,000.00 to Wilshire on 17 April 1964. Our Supreme Court has stated:

"The legal effect of a valid tender is to relieve the debtor from any interest or penalties due for a failure to pay the debt when due, and for any costs afterwards accrued." Peterson v. Central Arizona L. & P. Co., 56 Ariz. 231, 237, 107 P.2d 205, 208 (1940).

And our Court has discussed what may constitute a "sufficient tender". Bullard v. Garvin, 1 Ariz.App. 249, 401 P.2d 417 (1965). The question of the validity of the tender in this matter is a fact question which will have to be determined by the trial court on remand.

The judgment is reversed and remanded with directions that the trial court determine the validity of the tender and the amount of defendants' counterclaim, and grant judgment thereon.

DONOFRIO and STEVENS, JJ., concur.