437 P.2d 658

## MODERN PIONEERS INSURANCE COMPANY, an Arizona corporation, Appellant,

### v.

## Oscar S. NANDIN, and Carmen G. Nandin, his wife, Appellees.

### No. 8377.

Supreme Court of Arizona.

In Banc.

Feb. 21, 1968.

**126**

William P. Lutfy, Allan K. Perry, Phoenix, for appellant.

Alena Cantor, Herbert Mallamo, Phoenix, for appellees.

McFARLAND, Chief Justice:

Plaintiff-appellant brought an action against defendants-appellees (hereinafter referred to as Nandin) to foreclose a chattel mortgage and a real-estate mortgage. The defense was usury. Both parties made motions for summary judgment. The superior court denied plaintiff's motion, and sustained defendants'. Plaintiff appealed.

The following facts are undisputed: There is an office building at 811 North Third Street, Phoenix, Arizona. Signs outside the building proclaim that it houses Modern Pioneers Insurance Company (hereinafter referred to as MPI) and Modern Pioneers Life Insurance Company (hereinafter referred to as MPL). Acoma Investment Company (hereinafter referred to as Acoma) also occupies the same suite, but has no outside sign.

MPI is a "mutual benefit" corporation. Joe Schmitt is director, president, and member of its loan committee. Marie Schmitt, Joe's daughter, is assistant secretary, accounting consultant, member of its loan committee, and supervisor of its books and records. Don Schmitt, Joe's son, is vice-president, director, and a member of its loan committee. Fred Schmitt, also Joe's son, is a part-time employee, but not an officer. One Charles Burton, a Washington lawyer, is also a vice-president.

MPL is an Arizona corporation. Joe Schmitt is president and director. Don Schmitt is vice-president and director. Marie Schmitt is secretary, treasurer, and director. Fred Schmitt works nearly full time for the corporation. There are several other persons who are vice-presidents and directors.

Acoma is an Arizona corporation. Since its name does not appear on the outside of the building, prospective customers can find it only by entering the offices of the two insurance companies and inquiring of the re-

ceptionist. Receptionist for all three corporations is Helen Schmitt, Joe's wife, who works without pay. Officers of Acoma are: Donald Schmitt, president and director; B. C. McNichols, vice-president and general manager; Fred Schmitt, treasurer and director; Marie Schmitt, secretary, director, bookkeeper without pay, and supervisor of collections. Charles Burton and Robert Weaver are also directors.

All three firms have the same telephone number. The building is owned by Acoma, which is buying it from MPL. Payments are $355.05 per month. MPL and MPI each pay Acoma $187.50 per month rent. *Each insurance company owns one-half of the entire capital stock of Acoma, which pays an annual dividend of one hundred per cent.*

Although both insurance companies "at times" make loans to borrowers without using Acoma's brokerage services, the latter acts as broker for the major portion of all loans made by the two Pioneer companies. McNichols states that the amount of each brokerage fee charged by Acoma is set by him.

It is quite clear that Joe Schmitt has complete control over all three companies whether or not he chooses to exercise it, as he and his immediate family occupy the key positions. By means of changing the monthly rent or the dividends declared by Acoma, or by renegotiating the building-purchase contract, funds can be shunted to or from whichever corporation he selects, although there is no evidence that this has been done. Despite the presence of his wife, two sons, and a daughter in these strategic positions, he and his daughter profess ignorance of much of Acoma's activities, and have been less than frank in their answers to questions put to them at the taking of their depositions.

McNichols, in his deposition, stated that he couldn't even sign checks for Acoma without Marie's co-signing, had never even seen the company's checkbook, and, although the company's books were subpoenaed, Marie told him that he couldn't take them to the hearing, even though he was

vice-president while she was only an unpaid secretary and bookkeeper for that corporation.

Defendant-appellee Oscar Nandin owned some real estate, and ran a grocery store and tavern on part of it. His financial situation was desperate. He applied for a loan at a Phoenix bank where the man with whom he spoke referred him to Acoma. At Acoma he signed a brokerage agreement, a copy of which has not been transmitted with the record. It appears to have provided that Acoma would act as his agent, and that he would pay Acoma $3,920 (8 per cent) for its services. He was not informed that Acoma was wholly owned by MPI and MPL. The opportunity to make the loan was first offered by Acoma to Greater Arizona Savings and Loan Association. It does not appear whether this was done because the loan was not attractive to MPI or MPL, or because these companies did not have funds to loan at the time, or for some other reason. It was then offered to MPI which also refused it.

After talks between Acoma and Nandin, during which it was made clear to him that his financial statement was so poorly prepared that MPI would not make a loan based on it, Nandin was persuaded to hire one Joe Keyes, an accountant. Keyes got the application and financial statement in good enough shape for MPI to reconsider the loan, and Joe, Marie, and Don Schmitt, acting as MPI's loan committee, approved it.

By December 11, 1962, the parties were ready to consummate the loan, and an escrow was opened with Stewart Title and Trust Company. The loan was to be evidenced by Nandin's promissory note for $49,000, with interest at eight per cent (the maximum rate allowed by A.R.S. § 44-1202), payable over a 15-year term, at $468.-79 per month, and secured by a chattel mortgage and a mortgage on Nandin's real property. The escrow instructions were signed by McNichols for MPI although he was not an officer or employee of that company.

The instructions provided, among other things:

"$3,920 as a brokerage fee to Acoma to be paid out of funds in escrow;

Nandin to furnish Mortgage A & C tax service ($13.50);

$15.00 annual service fee to be paid to Acoma (for collecting the monthly payments and remitting to MPI);

Nandin to keep using an accountant approved by MPI and to furnish a monthly operating statement; and

Payment by Nandin of all expenses of the transaction.

In addition to the above, Nandin was required to pay $75 for the bill of the independent appraiser, $5.00 for a credit report on himself, and $13.75 for a title search. Since Nandin was to pay all expenses of the transaction, it follows that he had to pay the title-policy premium, escrow fees, the charge for recording MPI's mortgage, etc.

Written demands were made by letter on two occasions by MPI. The letters were signed by Marie Schmitt as secretary-treasurer of MPI. She stated that this was a mistake; that she was never an officer of MPI; and that the letters were prepared by the company attorney who, at the deposition, stated that it was his mistake and not hers. Marie, however, admitted she signed the letters for MPI, so that even though she was not an officer, she nevertheless clearly took park in MPI's operations.

Further evidence of Marie Schmitt's lack of frankness, and of the fact that she acted in whatever capacity was convenient, is furnished by the fact that she "attested" the real estate mortgage being foreclosed in this case, *as assistant secretary of MPI.* There has been no denial of this fact, nor claim of mistake.

From these facts it is apparent that even though there may have been perfectly legitimate reasons for the use of three separate corporations (for tax reasons, to comply with insurance laws and regulations, etc.) the whole empire is obviously family-controlled and must be examined with extreme care, lest it be used to thwart the law.

"If we look back upon history * * * we shall find that there is scarcely any people, ancient or modern, that have not had usury laws. The Romans * * * had the deepest abhorrence of usury. It will be deemed a little singular that the same voice against usury should have been raised in the laws of China, in the Hindu institutes of Menu, in the Koran of Mohomet, and perhaps, we may say, in the laws of all nations that we know of, whether Greek or barbarian. In England, usury was an object of hatred and legal animadversion, at least as early as the time of Alfred * * * The statute of usury is interposing its warning voice between the creditor and the debtor * * * and teaches a lesson of moderation to the one, and offers its protecting arm to the other." Sherwood v. Roundtree, 32 F. 113, 124 (C.C.1887)

Our usury statute, A.R.S. § 44–1202, provides:

"No person shall *directly or indirectly* take or receive * * * any greater sum * * * for the loan or forbearance of any money * * * than eight dollars on one hundred dollars for one year. Any person, contracting for, reserving or receiving, *directly or indirectly*, any greater sum * * * shall forfeit all interest." [Italics ours.]

It is admitted and undisputed that Acoma represented MPI in some ways. McNichols deposed that Acoma was in charge of obtaining mortgages to be placed with various lending institutions with which Acoma had "brokerage arrangements," which included MPI and MPL. Acoma took care of obtaining a title search to be sure that the security for the mortgage was clear. Acoma was designated in MPI's escrow instructions as its agent to collect the monthly payments. Despite these facts, MPI's position is that Acoma was Nandin's agent and not MPI's.

We have held that:

"* * * A person will not be permitted to take on himself the character of an agent, where on account of his relation-

ship to others he would be compelled to assume incompatible and inconsistent duties and obligations. * * *" Valley National Bank of Phoenix v. Milmoe, 74 Ariz. 290, 248 P.2d 740

Certainly Acoma, being wholly owned by MPI and MPL, fits the above description perfectly and could not be made Nandin's agent, even by signing a brokerage contract to that effect.

The situation is almost identical with the facts in Sherwood v. Roundtree, supra, in which the court, in its opinion, referred to " * * * the artful and specious device whereby the borrower is had to sign a paper stating that the person who negotiates the loan is his agent, when it is perfectly evident that he is the agent of the money lender."

The opinion goes on to say:

" * * * their business in this connection was that of loan agents * * * they represent the lenders in placing the loan, examining the titles, releasing the property from liens, insuring the property, and paying the taxes. * * * It appears that all their actions in the premises have been ratified by the lender. They were the agents of the plaintiff; and this is manifest notwithstanding the sedulous attempt to make it appear that they were the agents of the defendant. The fact is, this attempt is strongly indicative of the illegal character of this business * * * Is it not perfectly evident that this entire scheme is a device or shift to dodge the usury laws of the State of Georgia? *If not, why so careful to state that the subagent and correspondent of the Corbin Banking Company is the agent of the borrower?*" [Italics ours.]

In McHenry v. Vaught, 150 Ark. 612, 234 S.W. 995, the court stated:

" * * * Where a lender places money with an agent to be loaned, with the understanding that he must receive the highest lawful interest, and that the agent must look to the borrower for his commissions, the circumstances necessarily impute knowledge to the lender of an usurious bonus received by the agent upon each loan."

In Fowler v. Equitable Trust Co., 141 U. S. 384, 12 S.Ct. 1, 35 L.Ed. 786, the Supreme Court of the United States had before it a case with facts similar to the instant case. It said:

"It is not the case simply of a borrower employing a broker,—who has no regular or established connection with the lender as agent, and no arrangement with the lender with respect to compensation for his services,—to effect a loan, and agreeing to pay him commissions. * *. The arrangement amounted to no more nor less than requiring the agent to loan for a per cent sufficiently high to yield * * * the highest rate of interest allowed by the law and to pay the agent for his responsibility, labor, skill, and trouble. * * The policy of the statute is to protect the weak and necessitous from the oppression of the strong, and to sanction such transactions as this would be to defeat that policy."

See also Gully v. Gulf Coast Industrial Loan Co., 168 Miss. 768, 151 So. 754, and cases collected in 21 A.L.R. 797, 858. It is abundantly clear that Acoma was the agent of MPI for the purpose of making the loan, and could not have been the agent of Nandin because of conflicting interests.

The same result may be reached by analyzing the cases on the responsibility of corporations for the debts and torts of their subsidiaries. Ballentine says in his book on Corporations (Rev. 1946 edition):

" * * * [A]fter all, it comes down to a question of either agency or of good faith, honesty and fairness in the use of corporate privilege for legitimate ends. If a corporation is controlled by another and is manipulated by the parent for its own purposes and its own interests, to the prejudice of innocent third parties, or the public welfare, it may be necessary to hold the controlling party responsible." Op.Cit. p. 313

This does not mean that a corporation is liable for acts of its subsidiary simply because it is wholly owned. The concept of a corporation as a separate entity is a legal fact—not a fiction.

This court has arrived at the same conclusions. In Employer's Liability Assurance Corporation v. Lunt, 82 Ariz. 320, 313 P.2d 393, we said:

"* * * That a few individuals own the stock of the corporation or control its actions does not mean necessarily that the debts of the corporation should be imposed upon them personally, * * *

\* \* \* \* \* \*

"The corporate fiction will, however, be disregarded upon the concurrence of two circumstances; that is, when the corporation is, in fact, the alter ego of one or a few individuals and when the observance of the corporate form would sanction a fraud or promote injustice. * * *"

As previously noted, A.R.S. § 44-1202 provides that no person shall *"directly or indirectly"* take or receive more than the specified rate of interest. In view of the facts which we have set out in detail above, there can be no doubt that all of the items demanded by Acoma accrued to the benefit of MPI as the owner of fifty per cent of Acoma's outstanding stock. To hold differently would be to ignore entirely the meaning of the word "indirectly" in the statute.

In De Wulf v. Bissell, 83 Ariz. 68, 316 P. 2d 492, we said:

"* * * In deciding whether a transaction is usurious, the court will disregard the form and look only to the substance. * * *"

It is therefore clear that what Acoma was to receive must be added to what MPI was to receive, in order to determine whether usury was present—this on three distinct grounds: (1) because Acoma was actually the agent of MPI, (2) because we will disregard the separate corporate entities to prevent evasion of the usury statute, and (3) because due to the peculiar facts of this

case, MPI actually received a sufficient share of the payments made to Acoma, albeit "indirectly."

The disputed matters in this case are either matters of law, or immaterial facts. We are unable to find a material fact in dispute which would affect the result in this case, and a motion for summary judgment, therefore, was the proper method to seek a speedy decision. This opinion is based solely upon the undisputed facts set out herein.

There remains the question of which, if any, of the charges exacted from Nandin are improper. Since the note itself already bore interest at the maximum rate allowed by law, if any one of the extra charges was improper, usury results automatically.

We are aware of the rising costs of doing business. The resulting diminution of profits may tempt many to seek ways to achieve a gross return of more than the legal rate of eight per cent, and no doubt usury cases will begin to appear in our courts with greater frequency. We must, however, enforce the clear mandate of the law.

In Blaisdell v. Steinfeld, 15 Ariz. 155, 137 P. 555 (1914), we set out the five elements of usury as:

Unlawful intent;

Subject matter must be money or money's equivalent;

A loan or forbearance;

Repayment must not be contingent; and

An exaction that exceeds the legal rate.

In that case, at page 186, 137 P. at page 568, we said:

"The 'unlawful intent' referred to is presumed 'from the mere fact of intentionally doing what is forbidden by statute. It is not necessary that the parties shall know that in so doing they are violating the law.'"

In Seargeant v. Smith, 63 Ariz. 466, 163 P.2d 680, we quoted with approval parts of Blaisdell, and held:

"The courts will closely scrutinize every suspicious transaction in order to ascertain its real nature. * * * The court

will look to and construe the transaction by its substance and effect, rather than its form, and, if, from a consideration of the whole transaction, it becomes apparent that there exists a corrupt intent to violate the usury laws, the court will permit no scheme or device, however ingenious, to hide the face of usury."

In Grady v. Price, 94 Ariz. 252, 383 P.2d 173, we were confronted with the specific problem of whether certain charges were a violation of the usury statute. We said:

"* * * A lender may not disguise additional compensation for the use of money in an unreasonable or fictitious charge for services rendered, * * *

* * * * * *

"A lender, in addition to the highest rate of interest, may charge the borrower reasonable fees for services rendered in connection with the loan, or require reimbursement of expenses incurred, such as the examination of title, recordation of papers, and perhaps traveling expenses and other similar expenses. * * * But such charges must be limited to specific services rendered and expenses incurred, and may not be made a device through which additional interest or profit on the loan may be exacted, * * * Nor may a lender charge to a borrower the ordinary overhead expenses of his business. * *

* * * * * *

"While it is possible that the appellant Grady could have charged the appellees for some of the expenses he incurred in connection with the loans if such charges had been specific and in reasonable amount, we cannot approve a provision by which the lender adds a set percentage of the amount loaned as a blanket fee to cover indefinite expenses, some of which are certainly part of the normal overhead of the lending business, where that fee plus the rate of interest exacted exceeds the maximum rate of return permitted by the statute. To do so would open an easy avenue for avoidance of the usury penalties."

In the instant case McNichols testified that the brokerage fee was set by him at eight per cent, and that that figure was based upon the availability of funds, the work involved, and the time it would take to get the loan ready and find a market for it. Most of the work appears to have been done, however, by the bookkeeper that Nandin was forced to hire and pay for, rather than by Acoma. It is obvious that a brokerage fee of nearly $4,000 for what little was done by Acoma was unreasonable in the extreme, and since we have already held that part of it was indirectly received by MPI, in addition to a note bearing the maximum legal interest, this whole transaction must fail as usurious.

In Grady, supra, we indicated that some miscellaneous expenses, if reasonable, might be exacted by the lender in addition to the maximum interest allowable. What expenses are reasonable and proper, and chargeable to the borrower, is a difficult question to answer. In 21 A.L.R. 871, cases are collected on the propriety of various types of expenses, including appraisals, title-clearing, preparing and recording documents, insurance expense, collection expenses, and miscellaneous expenses. The authorities therein cited show that certain expenses such as title-policy premiums, appraisal fees, etc., are generally permitted to be passed on to the borrower. The same is true with many other fees and costs which the lender actually pays out, such as the cost of credit reports, etc. If, however, we continually expand the list of permissible items, it will eventually be possible for the lender to contract out all of his overhead, add the contractual payout to the interest, and obtain the maximum interest as his net profit instead of his gross profit from which his expenses must be paid. A typical example of this is the frequent requirement that the borrower pay for a service which checks twice a year to see that the borrower has paid the taxes on the property mortgaged for security. Before the presence of such services, the lender had to check the taxes, or demand to see the tax receipts. If he

had a large number of loans he might pay an employee to do this. This was as much a part of his overhead as his rent. It was not the intent of the usury statute that the lender should be allowed to collect the maximum rate plus his overhead. This was attempted in Strickler v. State Auto Finance Co., 220 Ark. 565, 249 S.W.2d 307. There the lender figured how many dollars he loaned in a year, how much his rent, overhead, salaries, etc., amounted to, and by simple arithmetic determined that the cost of each unit of $100 loaned was $6.92. He therefore charged the maximum interest and in addition he charged $6.92 per $100 of the amount of the loan. The Supreme Court of Arkansas called it usury.

In the instant case plaintiff moved for summary judgment. Defendant also moved for summary judgment and for a dismissal of the amended complaint. The trial court denied plaintiff's motion. It granted defendant's motion, and entered judgment in Nandin's favor for $5,433.37, and dismissed plaintiff's complaint. The $5,433.37 is the sum of three of the $468.79 monthly payments, plus the $13.50 for the tax service and the $3,920 brokerage fee. These last two items are clearly improper charges by the lender, but so is the $15.00 annual collection fee, and if paid by Nandin it should have been handled by the court in the same manner. The $75.00 appraisal fee, the fee of $13.75 for preliminary title search, and the $5.00 fee for a credit report are the types of charges that were held to be allowable in Grady, supra, and since there has been no contention that they were unreasonable they were properly allowed by the trial court in the instant case.

The difficulty is that the trial court should not have rendered a money judgment. It should merely have subtracted the total of the improper charges from the principal amount due, to give credit to Nandin against the principal for the payments he made, striking off all interest. Assuming that the $15.00 collection fee was paid out of escrow, the total credits should have been $5,448.37, which sum when subtracted from the $49,000 principal of the loan, would leave $43,551.63 as the unpaid principal balance. To this should be added the unpaid property taxes and the unpaid insurance premium on the $26,000 pre-existing insurance—if plaintiff advanced these items. Since the debt was to have been paid over a 15-year period in equal monthly payments, the principal balance should have been divided by the number of months left at the time of the motions, to ascertain the new monthly payment. A comparison of the improper charges to the new monthly payments would indicate how far in advance the monthly payments had been taken care of. The complaint was properly dismissed, as enough had been paid in advance to allow plaintiff to advance the sums necessary for taxes, etc., and Nandin was therefore not in default at the time of the filing of the amended complaint.

It is now necessary for the trial court to vacate its judgment and to recompute the correct amounts without interest. It is not known whether any payments have been made during the pendency of this appeal. After the correct balance is determined, if Nandin is now in default he should be given thirty days to bring his payments up to date before plaintiff is entitled to file a new foreclosure action.

Affirmed as modified, and remanded for further proceedings in accordance with this decision.

UDALL, V. C. J. and STRUCKMEYER, BERNSTEIN and LOCKWOOD, JJ., concur.