448 P.2d 859

Robert K. ALTHERR and Pauline Lawanda Altherr, Appellants,

v.

WILSHIRE MORTGAGE CORPORATION, Appellee.

No. 9299-PR.

Supreme Court of Arizona.

In Banc.

Dec. 27, 1968.

Rehearing Denied Jan. 28, 1969.

Leibsohn, Goldstein & Weeks, by Philip T. Goldstein, Phoenix, for appellants.

Hughes & Hughes, by Coit I. Hughes, Phoenix, for appellee; Carson, Messinger, Elliott, Laughlin & Ragan, by Larry Laughlin, Robert C. Broomfield, Phoenix, co-counsel for appellee on petition for review.

McFARLAND, Chief Justice.

This case is before us on a petition for review of the decision of the Court of Appeals, 6 Ariz.App. 576, 435 P.2d 83, as amended by that court's supplemental opinion, 7 Ariz.App. 438, 440 P.2d 319, by which decision that court reversed the decision of the Superior Court, and remanded the case for further proceedings. Decision of the Court of Appeals vacated.

Plaintiff-appellee, Wilshire Mortgage Corporation, hereinafter referred to as Wilshire, brought a mortgage foreclosure action against defendants-appellants Robert Altherr (doing business as A–1 Construction Company) and his wife Pauline. They will hereinafter be referred to as Altherr. The defense was that the note, which the mortgage secured, was given to replace prior notes which were usurious. The trial court, sitting without a jury, found that there was no usury, and gave Wilshire judgment.

Real estate mortgages recorded in Pima and Maricopa Counties alone total nearly one-half billion dollars per year, and Arizona's multimillion dollar construction industry, which is of vast importance to the State's economic health, would grind to a complete halt if legitimate loans were to be penalized as usurious because of a misunderstanding of the nature of the various charges necessarily collected in addition to interest. If the State's economy is to remain healthy, its construction industry must continue to attract huge sums of money at interest rates at or near the maximum allowed by law.

Local financial institutions have only enough funds to finance a fraction of the building that takes place in Arizona, and they must constantly replenish their capital in the Eastern money markets. For this reason major Arizona lenders sell their long-term loans to Eastern investors, thus preventing the exhaustion of their own funds which are used to keep pace with the State's rapidly expanding development. Home buyers desire long-term loans, in order to make the payments small enough to fit their incomes, and the F.H.A. and V.A. have encouraged this trend. Large Eastern investors do not want to have anything to do with the mechanics of individual loans— particularly construction loans—and prefer to make their purchases in blocks of $1,000,000 or more. They like to have their loans serviced by local institutions, and to have no duties in connection with loans made, except to collect and record the payments as they come due.

Construction loans, also known as interim financing, involve more complicated problems and higher risks than ordinary long-term loans. As a result, such loans are generally handled by firms having the necessary expertise, and are more expensive to obtain, than loans on completed buildings. The construction lender takes the risk that something may delay the completion of the project. Delay may cancel the already-signed leases which give the project value. Delay may sap the financial strength of the builder so that he goes broke. Delay may cause completion to be made at much higher prices, thus making the completed project unprofitable. In return for taking these higher risks, construction lenders seek high returns and rapid turnover of the money they have to loan. They expect construction loans to be paid when the buildings are completed, or very soon thereafter, out of the "permanent," or long-term loans that are generally arranged before construction starts.

■ The construction lender must be equipped with both the know-how and the personnel to remain in close touch with the project at all stages. This is necessary in order to be sure that proper licenses and inspections are obtained from all regulatory bodies, that the construction complies, at all stages, with the plans and specifications and with the regulations of the F.H.A. or other agency that is to insure the permanent loan, and that the money advanced periodically is actually used to pay off laborers and suppliers of material promptly, so that no mechanics' liens are filed, etc., *A charge for supplying such supervision is proper if it bears a reasonable relation to the cost of such services. Such a charge is not interest.* Modern Pioneers Insurance Co. v. Nandin, 103 Ariz. 125, 437 P.2d 658.

The record before us is voluminous. Nevertheless, as stated in the brief of amicus curiae:

"The provisions of the loan documents themselves are not too clear, and the transcript and the exhibits do not give too clear a picture of the underlying facts."

Altherr sought from Wilshire money with which to build houses on 104 lots which he owned. Though he wished to start on a small scale, Wilshire insisted that he contract for the financing of all 104 lots at once, and prepared two agreements which appear to have been signed simultaneously. They provide that:

1. "This will constitute our entire agreement" for both interim and long-term financing of all 104 lots.

2. Wilshire "will arrange the financing * * * on a 'package' basis at a total cost of 6½% of each loan. The package shall consist of 1½% *for interim financing* and 5% discount on the takeout."

3. Wilshire will process all F.H.A. loans from their inception to their delivery, and will collect from each purchaser-mortgagor, 1% of the loan, *for its services in processing the loan.*

4. Altherr will furnish, at his expense, title policies, fire insurance policies, credit reports on buyers, class "C" tax services for each loan, escrow and closing charges, etc.

5. Wilshire may disapprove the credit of any buyer.

6. All houses are to be eligible for F.H.A. insurance endorsements within ten months from the time the agreements are signed, and the contract shall expire in twelve months.

7. Altherr shall deposit, *in advance*, one per cent of the total amount of the *anticipated long-term* loans on all 104 lots. (One per cent of $1,745,500 = $17,455.) On those houses sold through F.H.A., Wilshire will (See Par. 3, supra) collect one per cent from the buyers and refund this amount to Altherr. On houses sold outside of F.H.A., or not sold at all, Altherr will get no refund.

8. Construction must not start until fifteen days after Wilshire receives title insurance policy.

9. Altherr will pay Wilshire 6½ per cent on money disbursed, from time of each payment, and Wilshire will disburse money weekly to cover labor and materials expended on the houses being built.

10. Altherr agrees to pay reasonable attorneys' fees in a proper case.

The weekly disbursements for buildings in the process of construction are known in the trade as "draws" or "drawings." Wilshire construed the agreements to mean that Altherr had to pay *in advance of receiving any money at all*, the one per cent, or $17,455, mentioned in Paragraph 7, supra, and the 1½ per cent mentioned in Paragraph 2, supra. This latter amount was figured as 1½ per cent of an *anticipated* total of *interim* loans of $1,457,600, or $21,864. The total of the one per cent and the 1½ per cent ($39,319) was deducted from the first draws, and interest was charged on that amount from a date not only prior to the advancing of any money, but also prior to the date the contracts were signed!

It is clear that the interim and the permanent financing were a package deal— i. e., Altherr couldn't take one without the other. Nevertheless, *the fees for each item*

*were specifically allocated and described.* Thus, on the interim loans, the interest for the use of the money was 6½ per cent, and the fee of 1½ per cent was *"for interim financing"*; on the long-term loans, the interest was to be at the highest rate allowed by F.H.A., but, in addition thereto, there were two additional fees: (1) A five per cent discount that Altherr would pay by receiving only ninety-five per cent of the amount loaned, and (2) a one per cent fee which Wilshire was to receive *for processing the F.H.A. loans,* and, though it was to get this amount in advance from Altherr, it would collect from the house buyers an equal amount and refund it to Altherr. Amicus curiae ask that we indicate whether these fees are legal, or whether this Court, like the Court of Appeals, considers them to be fees for the use of money, and therefore interest.

■ We will first take up the fees for processing the F.H.A. applications. We have repeatedly held that fees charged for services rendered are not interest *if they are reasonable.* Modern Pioneers Ins. Co. v. Nandin, supra; Grady v. Price, 94 Ariz. 252, 383 P.2d 173. But, in Grady we said:

"* * * we cannot approve a provision by which the lender adds a set percentage of the amount loaned * * * to cover indefinite expenses * * *, where that fee plus the rate of interest exacted exceeds the maximum rate of return permitted by the statute. * * *"

■ The instant case is even stronger, because Wilshire forced Altherr to use Wilshire's organization to process the F.H.A. loans (by the device of the "package deal") even though Altherr might have either processed the loans himself or hired an expert to do it for him at a fraction of Wilshire's charge of $17,455. If the charge was reasonable, it would not be considered interest. But if such a charge is unreasonable, and the borrower is forced to accept the lender's services at an unreasonable rate *in order to get the loan,* then it may be said, fairly, that the excess of the fees over what would be reasonable, is a charge for the loan, and hence is interest. It makes no difference that Wilshire was to charge the homebuyers the same one per cent fee and use that money to repay the advance of Altherr. Wilshire would still be receiving the one per cent and the statute prohibits the *receiving* of the usurious interest. A.R.S. § 44–1202.

■ The second fee required of the borrower, by Wilshire, was a five per cent discount "on the takeout." In the trade this means that if the permanent loan was for $1,000 Wilshire would take $50 of that amount, so Altherr would get only $950. This is a common practice, similar to that of many lending institutions which refer to them as "points." If a lender made an eight per cent loan, and, in addition to the interest, required the borrower to pay points, or a discount, usury would be clear immediately. But *where the points or discount are required on a long-term loan, the amount involved must be spread over the entire term of the loan to determine whether the eight per cent maximum allowable interest is exceeded.* Thus, a five per cent discount on a 20-year loan would mean roughly an increase in the interest rate of one-fourth per cent per year. In the instant case we have an interest rate, plus a discount of five per cent, to be spread over a long term, plus the one per cent fee for processing the F.H.A. loans. If, as appears to be the case, the permanent financing was for 30-year terms, the total interest would appear to be within the eight per cent allowed by statute.

■ When we say that an unreasonable fee, which the borrower is forced to pay in order to get the loan, will be considered interest, we do not mean that it is interest only when there is such compulsion. When a borrower is not *compelled* to use the lender's services, but allows the lender to perform them, and then finds himself presented with an unreasonable bill for them, a situation is created where the unreasonable portion of the charge may be considered to be interest, since it is a direct result of borrowing the money.

The crux of the problem in the instant case is the fee of 1½ per cent "for interim financing." We do not agree with Altherr's contention that the 1½ per cent may be added to the 6½ per cent interest to total eight per cent, and that since part of that sum is payable in advance usury automatically becomes evident under the doctrine of Houchard v. Berman, 79 Ariz. 381, 290 P.2d 735, 57 A.L.R.2d 627. As we have previously noted, the fee for interim financing is a fee for many services rendered by the lender. The charge of 1½ per cent on the anticipated advances was $21,864. Wilshire argues that it was not its fault that the anticipated advances were not all made and that only $582,028.49 was actually loaned. We do not agree. At the time of the second draw, Wilshire refused to pay the money to Altherr unless and until Altherr signed an amendment to their agreements providing that Altherr could not start over fifteen houses initially, and that Wilshire might further limit new starts if it so desired.

■ At a later date, Wilshire took the position that no further starts would be allowed unless Altherr had buyers waiting to purchase the finished houses. But, even though it were not Wilshire's fault that all of the advances were not made and that only forty of the 104 homes were built, it still remains necessary for Wilshire to prove that the fee of 1½ per cent was a reasonable charge for the various services which it rendered as interim lender—checking inspections, licenses, compliance with plans and specifications, payment of labor and material bills, securing lien waivers, keeping separate ledgers on each house, figuring weekly draws, etc. Wilshire made no showing of how many persons were employed for this purpose, what hours they worked, what pay they received, etc. Once it appears, prima facie, that the legal maximum interest rate is exceeded—as here—the burden is on the receiver of the excess to show that it represents the reasonable value of services rendered.

In Adjustment Service Bureau v. Buelow, 196 Minn. 563, 265 N.W. 659, the court said:

"If, as claimed by the plaintiff, there were any services rendered by it, which entitled it to retain something out of this loan and pay out thereon only $150, it would be entitled to retain only the reasonable value of any services so rendered. There is here no evidence of the value of any services claimed to have been rendered. * * *"

■ Amicus curiae argue that the 1½ per cent should be considered, not as an interim financing fee, but as a "commitment fee," i. e., a fee paid for a promise to have the money available for long-term loans to buyers when and if they were procured. Under proper circumstances a reasonable commitment fee is undoubtedly legal, and is not interest. However, even amicus curiae admit that it can be used as a cloak for usury, under certain conditions.

■ Where a reasonable commitment fee is charged under proper circumstances, the failure of the borrower to use part or all of the money committed, will not of itself make the charge unreasonable or illegal. The determination of its legality requires an ad hoc approach. Pertinent factors would be the tightness or looseness of money, the amount of the fee, the rates prevailing in the short-term money market where the lender might keep the funds while waiting for the borrower to call for the loans, etc. What would be a reasonable fee at one time might be unreasonable at another. Each case must necessarily require a decision on its own facts, and no case would be authority for another with slightly different circumstances.

We need not, however, go further into the problem in the instant case because the contracts between the lender and the borrower *specifically refer to the 1½ per cent as an interim financing fee*, not as a commitment fee. Also, there is some doubt whether Wilshire actually committed itself to furnish the money. It merely contracted to "arrange" the financing, and then

prevented Altherr from starting as many houses as he desired; it therefore now can hardly be heard to say that the failure to use all of the committed funds was Altherr's fault.

Usury does not arise from the mere taking of excessive interest, where there is no intention to violate the statute—as where a mistake is made in computing the interest. In the instant case, the agreement was to pay 1½ per cent for interim financing. At the time of the advance deposit of 1½ per cent on the total construction funds which both parties anticipated would be loaned, Wilshire did not know that some of the committed funds would in fact not be used. We have held that the borrower cannot, by his conduct, turn a legal loan into a usurious one. Small v. Ellis, 90 Ariz. 194, 367 P.2d 234. Therefore, Altherr could not, by failure to use all of the available funds, make this contract usurious. Contrary to Altherr's contention, we construe the contract between the parties to mean that while Wilshire could and did require an advance deposit of the total amount expected to be earned, its right to retain that amount was contingent upon its actual earning of that amount. Therefore, when the amount of construction money actually advanced turned out to be far less than the amount anticipated, Altherr was entitled to a return of the over-deposit. The over-payment was the result of a mutual mistake in estimating the amount of money that would be advanced. It was not usury. The same reasoning applies to the one-per-cent fee on the permanent financing. The unearned portion of that fee must also be credited to Altherr, as of the date of his default.

It is therefore clear that the decision and the judgment of the Superior Court must be vacated, and the cause must be remanded for further proceedings consistent with this opinion. On remand, it will be necessary to treat the excess of the advance deposit of the fees of one per cent

and the 1½ per cent as money to which Altherr was entitled to credit at the time of his default. Evidence will have to be taken to prove the reasonable value of the services rendered for the 1½ per cent fee. If 1½ per cent of the construction funds actually advanced exceeds the reasonable value of the services actually rendered for that fee, the excess must be deemed interest, under the rule of Modern Pioneers Ins. Co. v. Nandin, supra. Such interest, if any, must then be converted to an *effective* percentage rate (as opposed to a nominal rate) by ascertaining the terms of the construction loans.

After computing the effective rate represented by the excess interest charged for interim financing, over and above the reasonable value of the services rendered for the 1½ per cent fee, that rate must be added to the 6½ per cent interest charged, to determine whether the contract was usurious. If it is determined to be usurious, all interest is forfeited in accordance with A.R.S. § 44–1202.

The elimination of the interest—if it is proved to be usurious—and the crediting to Altherr's account of the advance over-deposit, may affect the validity of the tender made by him and refused by Wilshire. It may even completely eliminate the default, and thus affect the right to attorney's fees.

In connection with the tender, Wilshire claims that the tender was made to a corporate clerk who had no authority to accept the money. But the clerk telephoned the corporation's attorney, who advised her to refuse the tender, so that there is no merit to the claim that the tender should have been made to the attorney instead of to the clerk.

Reversed and remanded for further proceedings in accordance with this opinion.

UDALL, V. C. J., and STRUCKMEYER, BERNSTEIN and LOCKWOOD, JJ.