The KISSELL COMPANY,
Defendant-Appellant,

v.

Forrest GRESSLEY and Emily Gressley, husband and wife, and Mountain View Garden Apartments, Plaintiffs-Appellees.

No. 76–3039.

United States Court of Appeals,
Ninth Circuit.

Jan. 25, 1979.

Rehearing Denied March 2, 1979.

Burton M. Apker (argued), Neville, Laliss & Tanner, Evans, Kitchel & Jenckes, Phoenix, Ariz., for defendant-appellant.

John P. Otto (argued), Philip Gerard (argued), Phoenix, Ariz., for plaintiffs-appellees.

Before ELY and CARTER, Circuit Judges, and GORDON THOMPSON, Jr., District Judge.*

JAMES M. CARTER, Circuit Judge:

In this diversity case, Kissell, a mortgage banking company, appeals from judgment rendered against it for having wrongfully retained a mortgage on a piece of property after a description of that property was erroneously inserted into a mortgage to which Kissell was entitled as security for certain loans. The Gressleys and Mountain View Garden Apartments (hereinafter referred to collectively as Gressley) recovered $119,785.93 in actual and punitive damages on this count. Kissell also appeals from a determination that it charged a usurious rate of interest on the loans. Under Arizona law, a usurer must return to the borrower all interest paid on a usurious loan. Under this count, Gressley recovered an additional $27,850.00.

The facts show that Gressley, a housing developer in Arizona, signed loan agreements totalling $690,000 with Kissell in 1972. Of that amount, $52,000 was used to purchase the land, $73,000 was to be used to develop the land, and $565,000 was to be used to construct apartment dwellings on the land.

The loan agreements called for interest rates ranging between 7¾% and 8½%, or 2% over the prime rate at specified New York banks, adjusted according to which rate was higher. Kissell also charged loan fees of $1,040 on the land purchase loan, $1,460 on the land development loan, and $5,650 for the construction loan. Finally, Gressley signed an agreement which obligated him to pay to Kissell $203 for each of the 37 units in the eventual development for which the permanent buyer did not obtain permanent financing from Kissell. This was apparently intended to motivate Gressley to persuade permanent buyers to finance through Kissell. Gressley gave Kissell, in advance, a note for $7,511 ($203 × 37) and

was to be reimbursed pro tanto for each unit Kissell financed. It is the character of this money which determines whether the charges Gressley paid were usurious.

The property in question consisted of a parcel divided into 37 lots and a contiguous piece known as "tract A". Although both parcels were paid for with the $52,000 land purchase loan money, the trial court found that only the 37 lots were intended to serve as security for the loans. Kissell does not dispute that finding here. After Gressley executed mortgage documents on the 37 lots, they were given to Kissell, who then inserted tract A into the description of the property and recorded the mortgage. Later, when Gressley attempted to obtain separate financing to develop tract A, the cloud on his title was discovered and the other lender refused to go ahead. Kissell held tract A hostage, claiming it was always intended to secure the loans, and demanded payment for its release. Kissell does not dispute the trial court's holding that this retention of the mortgage on tract A was wrongful.

Apparently as a result of Kissell's refusal to release tract A, Gressley was unable to continue with either project. He sold his interest in them to another developer for $187,000 and paid off Kissell. Count I of Gressley's complaint below was for recovery of the value of tract A and other damages arising out of Kissell's refusal to release it.

Of the $690,000 originally committed, Kissell actually disbursed only $165,201.89 before the project went sour and the controversy discussed above arose. Gressley paid a total of $29,684.01 in charges and fees for that money, and Count II of his complaint below sought recovery of those charges and fees under Arizona usury laws.

The trial court awarded Gressley damages under Count I in the following amounts:

$40,000.00 as the value of tract A,

$73,200.00 as lost profits on the project(s), and

---

* Honorable Gordon Thompson, Jr., District Judge, Southern District of California, sitting by designation.

$15,000.00 as punitive damages.

This was reduced by $8,414.07, which was that portion of the profits on the sale of the entire project attributable to tract A. As to Count II the court found that, of the money paid as charges and fees, $27,850.88 constituted interest, and because it was usurious, Gressley was entitled to recover it. Thus, his total recovery amounted to $147,-636.81.

## I. ISSUES

A. *Damages*

1. Were the lost profits Gressley expected to earn on the project so speculative as to preclude their inclusion in the damage award?

2. Did the damages award include any duplicate recovery?

B. *Usury*

1. Did the individual charges which Gressley paid constitute interest on the funds received so as to make the loan usurious?

2. May Kissell avoid usury on these facts by means of a savings clause which purports to negate usurious intent and provides for a reduction in the interest rate if it exceeds the rate allowed by law?

## II. DISCUSSION

A. *Damages*

1. *Were lost profits too speculative?*

▮▮▮ Kissell admits liability for its wrongful refusal to release the mortgage on tract A, but it challenges the size of the award. It argues that, in light of the depressed housing market in Maricopa County where the development was located, Gressley should not have recovered any lost future profits because they were too speculative. Kissell cites *United States Fidelity & Guaranty Co. v. Davis*, 3 Ariz.App. 259, 413 P.2d 590 (1966) for the proposition that where the fact of damages is not proved, there can be no recovery, and it contends that its concession on the issue of liability for damages is not enough to prove the fact

of lost future profits as part of those damages.

Gressley's evidence showing expected profits consisted of his own testimony on past experience with similar projects. This was supported by exhibits accepted into evidence which gave substance to his claims. Kissell chose not to rebut that evidence.[1] Under *Nelson v. Cail*, 120 Ariz. 64, 583 P.2d 1384, 1387 (1978) such evidence is sufficient as prima facie proof of loss of expected profits. Once the *fact* of loss is thus proven, courts will not quibble over the numbers involved, but will use a lenient approach to measurement of those damages. *See, e. g., Id.; L.H. Bell & Associates, Inc., v. Granger*, 112 Ariz. 440, 543 P.2d 428 (1975); *Isenberg v. Lemon*, 84 Ariz. 340, 327 P.2d 1016 (1958). In light of Gressley's unrebutted testimony on the profits he expected to earn on the project, we can not say that such profits were so uncertain, contingent, conjectural, or speculative as to preclude their recovery. *See Fireman's Fund Insurance Co. v. Shawcross*, 84 Nev. 446, 442 P.2d 907 (1968). *Compare Schuldes v. National Surety Corp.*, 27 Ariz.App. 611, 557 P.2d 543 (1976); *United States Fidelity & Guaranty Co. v. Davis, supra.*

2. *Duplicate recovery?*

▮▮▮ As noted above, part of Gressley's award included $40,000, which the trial court found to be the full value of tract A at the time Gressley was forced to sell it. Kissell contended at oral argument that this represented to some unspecified extent a double recovery, because the sale price of the entire project ($187,000) included recovery of some of the value of tract A. Gressley, on the other hand, argued that the sale price of the project included only the value of the 37 lots, plus improvements thereon, and that, in effect, he was forced to relinquish his interest in tract A without compensation. Although the record is not entirely clear on the matter, we are of the

---

1. No evidence on the alleged depressed housing market was presented at trial; Kissell raises it for the first time here.

opinion that there probably was duplicate recovery, and we remand for a factual determination of the amount.

There are two reasons for our conclusion. First, Mr. Gressley's testimony at trial indicates that his interest in tract A was given up for value. When asked on direct examination about the sale of his interest in the project, Mr. Gressley testified as follows:

"I found a buyer and I endeavored to sell just the project lots 1 through 37 and retain Tract A. My buyers knew what had happened and knew what was going on and they would not buy it without buying the whole thing, and they paid me $187,000 for the project." Transcript A at 62.

Later, on cross-examination, the following exchange took place between Mr. Gressley and counsel for Kissell:

"Q: To whom did you ultimately sell Mountain View?

"A: P & K Development.

"Q: What was the sale price?

"A: $187,000.

"Q: And that included what?

"A: The loan payoff to the Kissell Company and the balance to me.

.     .     .     .     .

"Q: What did P & K get from you for its money?

"A: It got all of Tract A and the 1 through 37 lots and the houses in the stage of construction that they were, the four units." Transcript A at 97.

The foregoing suggests to us that the sale price of the entire project included some payment for release of Gressley's interest in tract A.

Second, the trial court itself gave tacit recognition of Gressley's having been compensated to some extent for tract A when it reduced his damages by $8,414.07 and designated this amount as profits attributable to tract A which were realized upon the sale. We do not understand how Gressley could have profited from the sale of tract A if he did not recover at least what he paid for it.[2]

Double recovery is disfavored. *See generally Adams v. Dion*, 109 Ariz. 308, 509 P.2d 201 (1973); *Ball Corp. v. George*, 27 Ariz.App. 540, 556 P.2d 1143 (1976). It should be particularly avoided where, as here, punitive as well as compensatory damages were assessed. *See Erie Basin Metal Products v. United States*, 150 F.Supp. 561, 138 Ct.Cl. 150 (1957). We therefore remand, and direct the trial court to reduce Gressley's judgment by an amount equal to that portion of the value of tract A which Gressley recovered when he sold the entire project for $187,000.

### B. *Usury*

#### 1. *Were the loans usurious?*

Kissell next contends that the $7,511 paid on the note should have been characterized as a commitment fee for permanent financing, and under *Altherr v. Wilshire Mortgage Corp.*, 104 Ariz. 59, 448 P.2d 859 (1968), would not be considered interest. In the alternative, it argues, the note should have been viewed as front-end interest on the permanent loan, not as interest on the interim financing. In either case, the objective sought is to reduce the effective interest rate on the money loaned to below the maximum allowed by law.

2. This, in turn, suggests to us a possible formula for determining the extent to which Gressley recovered the value of tract A when he sold the entire project. We propose it for consideration on remand, but leave it to the trier of fact to determine the actual amount. The trial court found that tract A comprised 36.8% of the area of the entire project. It then multiplied 36.8% by the profits Gressley made on the sale ($21,-798.11) and came up with $8,414.07 as profits attributable to tract A. (Actually 36.8% of $21,798.11 is $8,021.70. Either the arithmetic was wrong, or else the percentage figure was incorrectly typed; $8,414.07 is *38.6%* of $21,-798.11.) If the same percent (36.8%) is multiplied by the cost of the whole parcel ($52,000), the resulting figure ($19,136) would be the amount Gressley recovered which represents the value of tract A. The difference between that amount and the value of tract A at the time it was sold ($40,000 – $19,136 = $20,864) would be the increase in value between purchase and sale, of which Gressley was deprived because of Kissell's wrongful acts. Gressley would be entitled to recover this amount.

The trial court treated the money as commitment fees, but found that, under *Altherr, supra*, it could still be viewed as interest. We agree with that view.

■ We do not find it necessary to rehash the excellent analysis found in *Altherr*. Suffice it to say that under *Altherr*, whether or not a commitment fee is interest depends upon all the facts and circumstances surrounding its assessment.

"Where a reasonable commitment fee is charged under proper circumstances, the failure of the borrower to use part or all of the money committed, will not of itself make the charge unreasonable or illegal. The determination of its legality requires an ad hoc approach. Pertinent factors would be the tightness or looseness of money, the amount of the fee, the rates prevailing in the short-term money market where the lender might keep the funds while waiting for the borrower to call for the loans, etc. What would be a reasonable fee at one time might be unreasonable at another. Each case must necessarily require a decision on its own facts, and no case would be authority for another with slightly different circumstances." 448 P.2d at 864.

Furthermore, if a lender exacts fees and charges for loans that exceed the maximum allowed by law, then there is a prima facie showing of usury and the lender has the burden of proving those fees and charges were not interest, but rather fees for services rendered or reasonable commitment fees.[3]

■ Here, no evidence at all was presented, either for or against the reasonableness of the commitment fees. Because, under the formula for computing effective interest rates applied here—the validity of which Kissell does not dispute—the rate

exceeded 18% per year, the burden shifted to Kissell to prove that what it characterized as commitment fees were reasonable. It failed to meet that burden.

■ Kissell's contention that the $7,511 should be treated as front-end interest on the permanent loans is likewise without merit because it specifically disclaimed in the loan agreement any intention of charging such front-end interest.

■ Kissell makes a third argument pertaining to the loan fees charged on the purchase, development and construction loans. It contends that those fees should be viewed as interest spread over the entire amounts of the loans for the entire life of the loans. This is consistent with *Altherr*, which also teaches that such loan fees are interest only to the extent they are earned, and if they are not earned, they should be returned to the borrower without being treated as interest. 448 P.2d at 865. However, even if Kissell's view is adopted, so that only the earned loan fees are viewed as interest, the effective interest rate still exceeds 18% per year.

We affirm the lower court in its holding that the $7,511 was interest on the interim loans, and that the effective interest rate which Gressley paid was usurious. The proper remedy under such circumstances is the return to the borrower of all interest paid. A.R.S. § 44–1202.

## 2. The savings clause

■ Kissell's final argument is that a "savings clause" in the loan agreement negates the intent element necessary to finding usury and thus purifies what might otherwise be a usurious transaction. The clause provides for interest rates that fluctuate with the prime rate at certain New

---

**3.** 448 P.2d at 864. This rule was stated in the context of a discussion of delivery fees, or fees for services rendered, as interest. Such fees are not normally viewed as interest unless they are unreasonable. We see no principled reason for distinguishing between delivery fees and commitment fees for purposes of assigning the burden of proving them reasonable. Both must be earned before they will not be viewed as interest, and a court is entitled to examine all the facts and circumstances surrounding the assessment of each fee in order to determine if they were so earned. Under these circumstances, the burden of proof should rest in the same place. See *Kamrath v. Great Southwestern Trust Corp.*, 27 Ariz.App. 102, 551 P.2d 92 (1976).

York banks, and purports to require the total interest rate to stay below the maximum rate allowed by law.

While it is true that intent is a necessary prerequisite to usury, it is not true, as would necessarily follow from Kissell's argument, that the lender must have a specific intent to commit usury. Rather, if the lender intends to charge the fees he does, and those fees are in fact usurious, the intent element is satisfied. This conclusion is strongly suggested in *Houchard v. Berman*, 79 Ariz. 381, 383, 290 P.2d 735, 737 (1955) where the court states:

> "If the face of the contract reflects a usurious charge, the intent will be presumed, otherwise the circumstances surrounding the transaction must show such intent."

Clearly, if a loan agreement is usurious on its face, and no interpretation of the agreement would allow a conclusion that it is not usurious (*Starkovich v. Southwest Savings and Loan Ass'n*, 14 Ariz.App. 382, 483 P.2d 795 (1971)), a savings clause will not salvage it. *See Southwestern Investment Co. v. Hockley County Seed and Delinting, Inc.*, 511 S.W.2d 724 (Tex.Civ.App.1974); *Terry v. Teachworth*, 431 S.W.2d 918 (Tex.Civ. App.1968). That is not the case here because neither party contends that the loan agreement was usurious on its face. Nevertheless, Kissell can not escape liability for usury. It was Kissell's wrongful acts with respect to the tract A mortgage which caused Gressley to stop development of the project and which triggered the acceleration of the loan payment schedule. The trial judge so found, and that finding is not disputed. Acceleration compressed the time period over which the fees paid were spread for purposes of computing interest, and the effective rate was thus made usurious. Under those circumstances, to allow Kissell to avoid the consequences of usury merely because a savings clause was inserted into the boilerplate of the loan agreement would seriously undermine the principles outlined in *Altherr, supra*.

Our holding that Kissell's contention regarding the savings clause is without merit is limited to the situation where interest charges exceed the rate allowed by law *and* the reason for that excess lies in some wrongdoing on the part of the lender. This is not inconsistent with the principles found in *Southwestern Investment Co., supra*, and *Terry v. Teachworth, supra*, and will not unduly threaten the ability of lenders to grant loans with variable interest rates, thereby enabling them to remain in business in a volatile money market.

## III. CONCLUSION

The case is remanded to the district court for a factual determination of the extent to which Gressley recovered the value of tract A when he sold the project to the new developer, and for a reduction in the judgment accordingly. In all other respects, the decision is AFFIRMED.