In the Matter of **MARYVALE COMMU-
NITY HOSPITAL, INC.,** an Arizona
corporation, Debtor.

No. B–9352 PHX.

United States District Court
D. Arizona.

Nov. 3, 1969.

John F. Sullivan, of Sullivan & Mahoney, Phoenix, Ariz., for trustee.

## OPINION

MUECKE, District Judge.

The debtor, Maryvale Community Hospital, Inc., an Arizona corporation, was incorporated as a non-profit corporation on December 12, 1959. From the 6th day of January, 1960 through the 30th day of June, 1962, the debtor, through its promoters, sold to the public, bonds totaling approximately $3,236,900. The bonds sold to the public were issued pursuant to an indenture of mortgage and deed of trust entered into between the debtor and Lane Title and Trust Company. The indenture was recorded July 6, 1960 in the Maricopa County Recorder's Office, Docket #3136, p. 145 and docket #3773, p. 149.[1]

The promoters of the Hospital represented to the public that the proceeds of the bond sale were to be used for constructing and equipping a hospital on the property securing the bonds under the indenture. The Hospital officially opened on August 24, 1961. The bonds sold by the debtor and its promoters became in default as to certain principal and interest payments and reserve provisions on or about June 1, 1962.[2] Thereafter, the operation of the debtor came into serious financial mismanagement and staff problems. The acts of the promoters and

---

1. See Appendix A for the pertinent portions excerpted from the Indenture of Mortgage and Deed of Trust Entered Into Between the Maryvale Community Hospital, Inc. and the Lane Title and Trust Company, Phoenix, Arizona, and incorporated herein by reference thereto.

2. The default on the bonds preceded court actions seeking receivership or Chapter X proceedings by approximately one year.

this mismanagement resulted in certain of the bondholders filing a civil fraud suit under the Federal and State Securities Act against the debtor and its promoters.[3]

In their law suit, the bondholders asked for appointment of a receiver as well as recovery for violations of securities law and civil fraud. The action itself resulted in a settlement in which the debtor recovered from the promoters, a sum in excess of $100,000.

Almost immediately following the suit filed in the federal courts by the bondholders, the original indenture trustee brought a foreclosure suit in the state court under the indenture. The indenture trustee also asked for the appointment of a receiver, and with the consent of the bondholders, a state court receivership was established in lieu of a federal court receivership.

In November of 1963, the indenture trustee who had initiated the state court proceedings entered into a stipulation with the debtor to dismiss the state court action and terminate the state receivership. Immediately thereafter, a group of bondholders, having previously filed an involuntary petition for reorganization of the debtor under Chapter X, sought the appointment of a federal receiver.

The Chapter X petition was strenuously opposed by the debtor, its directors, the indenture trustee, and the state court-appointed receiver. The debtor was served through its statutory agent as well as the state court receivers. While the debtor did not answer the creditors' petition at this time, answers contesting the jurisdiction of the Court were filed by the state court receivers and the Union Title Company.

On September 11, 1963, the Securities and Exchange Commission (SEC) filed a motion for approval of its appearance in the reorganization proceeding as a party in interest pursuant to the provisions of Section 208, 11 U.S.C. § 608, of Chapter X of the Bankruptcy Act. The Court approved the petition the same day and the SEC has actively participated in the proceeding since that time, acting as an aid to the parties and an advisor to the Court.

A hearing on the Chapter X petition was held in abeyance pending the state court receivership. When the parties to the state court receivership stipulated to dismiss this receivership and return the property to the debtor's management on November 26, 1963, the petitioning creditors immediately sought and obtained the appointment of a Chapter X receiver under Section 117, 11 U.S.C. § 517 of the Act to hold and protect the debtor's property pending the approval or dismissal of the creditors' petition for reorganization.

The debtor subsequently filed an answer controverting the material allegations of the creditors' petition and specifically objected to the Court's jurisdiction to approve a creditors' petition for reorganization against a non-profit corporation. A hearing on the issues was fixed by the Court for December 16, 1963, when evidence and argument were presented and briefs submitted on the jurisdictional issues raised. The SEC and the petitioning creditors supported the Court's jurisdiction while the debtor contested it.[4]

---

3. John L. Roberts, et ux., v. Maryvale Community Hospital, Inc., et al., Civ. No. 4737 PHX.

4. The basic jurisdictional issue raised by the debtor was that the Court was without jurisdiction to approve an involuntary creditors' petition for reorganization under Chapter X brought against a non-profit corporation because Section 4(b), 11 U.S.C. § 22(b) of the Bankruptcy Act limits involuntary bankrupts to, inter alia, " * * * any moneyed, business, or commercial corporation * * * " thereby excluding the debtor corporation. In re Michigan Sanitarium and Benevolent Association, 20 F.Supp. 979 (D.C.Mich.1937) and Hoile v. Unity Life Insurance Co., 136 F.2d 133, 148 A.L.R. 710 (4th Cir. 1943) were cited in support of the debtor's position.

On the other hand, the petitioning creditors and the SEC took the position that because of the expanded scope of the Chap-

On April 27, 1964, the Court issued Findings of Facts and Conclusions of Law declaring that the debtor was incorporated as an Arizona non-profit, non-stock membership corporation which could become a bankrupt under the Bankruptcy Act within the meaning of the term "corporation" found in Section 126, 11 U.S.C. § 526, as that term is defined by Section 106(3), 11 U.S.C. § 506(3) of Chapter X and that the Court had jurisdiction to approve the creditors' petition.[5] Accordingly, the petition was approved on May 11, 1964, and a trustee was appointed to take over the debtor's business and property for the purpose of rehabilitating and reorganizing it as a going concern.

The original Chapter X petition filed August 1, 1963 contained a statement of the affairs of the debtor and a listing of its assets and liabilities based on the debtor's financial statement of February 28, 1963 and an appraisal of the property. The liabilities amounted to $3,853,-885.13 and the assets were $1,508,241.49. The only operating statement available was dated August 31, 1962 and showed a gross operating loss to date of $58,528.88. The balance sheet of June 30, 1962, just after the Chapter X petition was granted, showed a current deficit of $553,922.63 and cash on hand of only $14,637.68.

Since the original Chapter X petition was filed and granted, the Hospital has progressed steadily from a bankrupt operation to a solidly based and profitable hospital. During the years the trustee was re-vitalizing the Hospital, numerous proposals to purchase the Hospital were received and negotiations were held on several different occasions. In August of 1968, the negotiations culminated in the sale of Maryvale Community Hospital to Good Samaritan Hospital. All of the assets of the debtor were purchased for cash in the amount of $5,110,000 plus the assumption of debts and various other considerations.

### STATEMENT OF THE CURRENT ISSUE

On October 23, 1968, the Trustee was directed to file with this Court on or before November 25, 1968, a plan for distribution of the proceeds of the sale of the debtor's property and any other remaining assets of the debtor among those having an interest therein. On the same date, the Court also determined that there was only one class of creditors—the bondholders.

On November 22, 1968, the Trustee filed his plan for distribution. The Trustee in Bankruptcy and the Indenture Trustee had determined that according to the terms of the indenture, there was a

---

ter X definition of "corporation" and the basic purpose of financially rehabilitating a debtor in Chapter X as opposed to liquidation of a bankrupt in a straight bankruptcy proceeding, the "moneyed, business or commercial * * *" limitation on involuntary bankrupts is inconsistent and in conflict with the provisions of Chapter X, Section 106(3), and is therefore inapplicable under Section 102, 11 U.S.C. § 502. This section of Chapter X states that the provisions of Chapters I to VII of the Bankruptcy Act, of which Section 4(b) is a part, shall apply to a reorganization proceeding "insofar as they are not inconsistent or in conflict with the provisions" of Chapter X. This position contended that the words "which could be adjudged a bankrupt under this Act" contained in the Chapter X definition of corporation, 106 (3), 11 U.S.C. § 506(3), referred general-

ly to Section 4 of the Act and thus the language "a bankrupt" included voluntary bankrupts, which of course would include a non-profit corporation. The *Michigan Sanitarium* and *Hoile* cases were said not to control since the former was decided under the old 77B which did not contain any broad definition of "corporation" like Chapter X and the latter was an insurance company and therefore specifically excluded from the Bankruptcy Act. For a discussion of this problem, see 6 Collier on Bankruptcy, 14th ed., par. 2.07(2), p. 322.

5.  Inasmuch as the objections to the plan of reorganization refer to this Court's initial assertion of jurisdiction over the debtor, the Court's findings and conclusions in respect thereto are set out in Appendix B.

total of $5,054,730.42 due the bondholders as of October 22, 1968, which amount included prepayment premiums and regular and defaulted interest to the date of the sale. In addition to this, the Trustee believed that the bondholders were entitled to $100,200 recovered in civil suit brought by a bondholder thus making the total due bondholders equal to $5,154,930.42. The total amount of all of the debtor's assets, which include the proceeds of the sale to Good Samaritan Hospital and other assets which have been reduced to cash, was as of October 23, 1968, $5,123,649.33. From these funds, the Trustee has made various disbursements according to Court order. Among these disbursements ordered by the Court was one to the bondholders of 125% of the principal value of their bonds. The remaining undistributed proceeds of the sale to Good Samaritan Hospital and other assets is approximately $956,500, which sum includes interest earned since the proceeds of the sale were paid to the Trustee.

The issue now before the Court is what to do with the remaining undistributed proceeds. It is the Trustee's position, according to his plan, that the undistributed proceeds be used to pay the bondholders in accordance with the terms of the bond indenture. According to the terms of the indenture, the bondholders are entitled to interest on interest at the rate of 8% per annum and a prepayment premium for the early retirement of the bonds. If the Trustee's plan is followed, all existing undistributed funds will be necessary to satisfy the terms of the bond indenture.

A variety of opponents have expressed their opposition to the Trustee's proposal to honor the bond indenture. There is unanimity among the Trustee's opponents in that all agree the bondholders should receive only the principal, plus 8% simple interest and nothing more. The exception to the rule is that the Securities and Exchange Commission would allow the bondholders interest on interest at the rate of 8% stating "in this case, the equities favor the bondholders." But even the Securities and Exchange Commission objects to the prepayment premium being paid to the bondholders.

One of the most articulate opponents of the Trustee's plan of distribution is the State of Arizona. It is the State's position that the Maryvale Community Hospital was a non-profit corporation which, according to its Articles of Incorporation and State law, must on dissolution distribute its assets to non-profit organizations or the Government. Since the Articles of Incorporation for a non-profit corporation are in effect—according to the State—a contract with the State, it is the State of Arizona which champions the cause of the non-profit organizations and the Government. It is asserted that the bondholders will be made whole by the payments to them of principal and simple interest at the rate of 8%.

The State of Arizona objects to the interest paid on interest and categorizes it as a default penalty. In support of its opposition, the State of Arizona cities In re Tastyeast, Inc. (3rd Cir. 1942) 126 F.2d 879 for the proposition that a bankruptcy court will not enforce a penalty. We believe *Tastyeast* is distinguishable from the present situation. *Tastyeast* held that whether the agreement was one to exact a penalty was a question of state law and under the state law of New Jersey, it was considered an agreement to exact a penalty. There are no Arizona cases exactly in point, however, we are given direction by the Arizona cases of Fagerberg v. Denny, 57 Ariz. 179, 112 P.2d 578 (1941) and Small v. Ellis, 90 Ariz. 194, 367 P.2d 234 (1961). The doctrine of these cases is to the effect that, where excessive interest is paid because of a contingency which occurrence is under the control of the borrower, the transaction is not thereby usurious. From these two Arizona cases, it would appear that there are instances in which excessive interest is not considered usurious. The Arizona courts have stated that the five essential elements of a usurious contract are: (1) an unlawful intent; (2) the subject mat-

ter must be money or money's equivalent; (3) a loan or forbearance; (4) an understanding that the sum loaned must be absolutely, not contingently, repayable, and (5) there must be an exaction for the use of the loan of something in excess of what is allowed by law. Blaisdell v. Steinfeld, 15 Ariz. 155, 137 P. 555 (1914); Seargeant v. Smith, 63 Ariz. 466, 163 P.2d 680 (1945); Small v. Ellis, 90 Ariz. 194, 367 P.2d 234 (1961); Modern Pioneers Ins. Co. v. Nandin, 103 Ariz. 125, 437 P.2d 658 (1968); See also United States v. Desert Gold Mining Co., 282 F.Supp. 614 (D.Ariz.1968). Unlawful intent is presumed from the intentional doing of that which is forbidden by statute. Blaisdell v. Steinfeld, *supra.*

■ Was there here an understanding that the defaulted interest and prepayment premium were absolutely, and not contingently, repayable? If so, and if by their payment the Arizona legal rate of interest, A.R.S. § 44–1202, is exceeded, the indenture is usurious and unenforceable. Modern Pioneers Ins. Co. v. Nandin, 103 Ariz. 125, 437 P.2d 658 (1968). The indenture provided for redemption and payment of the bonds prior to their date of maturity,[6] and for "interest at the rate of eight percent (8%) per annum on overdue interest and principal",[7] upon the occurrence of any event of default enumerated in § 6.1 of the Indenture. The Indenture provides in § 6.1(7) that there is an event of default "if a petition against the Corporation in proceedings under the corporate reorganization provisions of the National Bankruptcy Act * * * shall be approved by any court of competent jurisdiction and such approval shall not be withdrawn and the proceedings dismissed within sixty (60) days thereafter * * *."

Thus by the terms of the Indenture, the sums in controversy, i. e., interest on interest and prepayment premiums, are not absolutely, but contingently, repayable. Awarding them to the bondholders pursuant to the Indenture does not for this reason render the transaction usurious. Annot., 130 A.L.R. 73 (1941) supp. by Annot., 75 A.L.R.2d 1265 (1961); Annot., 37 A.L.R. 325 (1925), supp. by Annot., 76 A.L.R. 1484 (1932); Small v. Ellis, 90 Ariz. 194, 367 P.2d 234 (1961).

When one considers the fact that the indenture was drawn by the debtor and the promoters originally, and that such provisions providing for interest on interest and prepayment penalties were being used as a lure to catch investors, and that without such investors, there would be no hospital, we do not believe that the interest on interest or the prepayment penalties should be considered usurious or inequitable.

The case of Vanston Boldholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946) states that the bankruptcy court must be guided by equity even if equity conflicts with the specific terms of a contract. The State of Arizona also cites the *Vanston* decision for the proposition that to allow the bondholders interest on interest, even though allowed by state law, would be inequitable. We believe that the true effect of the *Vanston* case is that equity must be done and that what must be done depends on the particular facts and circumstances.

■ The Court in the *Vanston* case based its decision on the fact that to allow interest on interest would reduce the share of the subordinate creditors in the reorganized corporation. Here the Maryvale Bondholders are the only creditors and the State and various non-profit organizations are simply residual legatees.[8]

---

6. Indenture of Mortgage and Deed of Trust entered into between the Maryvale Community Hospital, Inc. and the Lane Title and Trust Company, Phoenix, Ariz. [hereinafter cited as "Indenture"] Art. IV.

7. Indenture § 6.2.

8. The Health Facilities Planning Council, Inc. has argued that the charitable beneficiaries can be compared to stockholders of a profit making corporation. We do not agree.

■ The State of Arizona asserts that there is no authority to allow payment of the prepayment premium and that in effect, it too is a penalty. The analogy is made that to allow interest on interest is to penalize for being too late and then in turn to allow prepayment premiums is to penalize for being too soon. On first reading, there seems to be much incongruity in allowing both payments. Yet long before any receivership or bankruptcy reorganization, the debtor was unable to make its interest payments to the bondholders.[9] The bondholders were entitled to these interest payments and were deprived of earning more money they would have received as interest. The Indenture by its specific terms entitled them to receive interest on interest. The bondholders would then also be entitled to receive their rate of interest at 8% for the full term of their bonds as stated in the Indenture but here again, the circumstances were such that instead of getting their guaranteed rate of interest for the full term of the bonds, they received a lump sum payment at the time of the sale of the hospital.

According to the specific terms of the Indenture, they were entitled to a premium for such payments. Interest on interest and prepayment as are found in this Maryvale bond indenture are not unreasonable or inequitable under the circumstances and facts of this case, since there is no group with a priority other than the bondholders. Were it not for the bondholders providing the money for the Hospital in the first instance, there would be no hospital. Were it not for the bondholders bringing suit, there would

have been no reorganization, the creditors would never have received full satisfaction of the debts, and the State and the "health consumers"[10] would not have had the present and future benefit of an active and functioning hospital.

Our attention is directed to N. Y. Trust Co. v. S. E. C., 131 F.2d 274 (2d Cir. 1942), cert. denied, 318 U.S. 786, 63 S.Ct. 981, 87 L.Ed. 1153, rehearing denied, 319 U.S. 781, 63 S.Ct. 1155, 87 L.Ed. 1725 (1943), in which the Court denied debenture holders a call premium whose payment had become impossible by supervening illegality. It is argued that the rationale of the N. Y. Trust is made applicable to this Chapter X proceeding by Bailey v. Minsch, 168 F.2d 635 (1st Cir. 1948), cert. denied, 335 U.S. 854, 69 S.Ct. 83, 93 L.Ed. 402 (1948). Here, unlike in N. Y. Trust, the debtor defaulted on the bonds prior to the institution of either the state receivership action or this Chapter X proceeding. Thus, the "implied condition" rationale of N. Y. Trust is inapplicable. In addition, the bondholders in the instant case are the only creditors of Maryvale, unlike in N. Y. Trust, and by reason of the terms of the Indenture, they are entitled to interest on interest and the prepayment premium.

Essentially, therefore, the difference between this reorganization and those described in the many cases[11] cited by those opposing what the Court here intends to do, can be simply stated: this reorganization has not been a funeral but a rebirth. The bondholders, by all of their actions, certainly helped bring about this happy and successful conclusion.

9. One of the circumstances in *Vanston* was that prior to the beginning of the equity receivership, the corporate debtor "had [not] breached its obligation to pay simple interest * * * on the date it was due." *Vanston, supra,* 329 U.S. at 166, 67 S.Ct. at 241, 91 L.Ed. at *168.*

That is not the situation here. Default on the bonds in the present case in fact led to institution of these Chapter X proceedings.

10. A term used by the Health Facilities Planning Council, Inc., who by using such

a term seek to create a special standing, giving them a priority similar to that of a creditor.

11. "This involuntary destruction of the corporation deprived it of any freedom of choice except perhaps as to the cost of its funeral."

New York Trust Co. v. S.E.C., 131 F.2d 274, at 276 (2d Cir. 1942), cert. denied, 318 U.S. 786, 63 S.Ct. 981, 87 L.Ed. 1153, rehearing denied, 319 U.S. 781, 63 S.Ct. 1155, 87 L.Ed. 1725.

There can be no quarrel with their success when this is achieved at no one else's expense. There being no other creditors, no one else can claim injury.

An order authorizing the Trustee to carry out the disbursal of the remaining funds in accordance with this opinion is being filed simultaneously with this opinion.

## ORDER APPROVING TRUSTEE'S PLAN OF REORGANIZATION

A hearing having been held on the 9th day of January, 1969, pursuant to the order of this Court dated October 23, 1968, on the plan of reorganization of Maryvale Community Hospital, Inc., the above named debtor, prepared and filed herein by Frank J. Dunning, trustee of said debtor, and for the consideration of any objections which might be made, or of such amendments or plans as might be proposed by any creditor, and for the determination of the claims of the creditors, bondholders and other parties in interest of the debtor, pursuant to Sections 196 and 197 of Chapter X, to establish the amount due to each claimant and notice of said hearing having been given as required by Section 171 of the Bankruptcy Act and in accordance with the said order of October 23, 1968; and Dr. Theodor Bratrud having proposed an amendment to the said plan; and certain objections to the said plan having been filed by Good Samaritan Hospital, Memorial Hospital, Health Facilities Planning Council, Inc., the State of Arizona, and the United Funds, more particularly: Phoenix, Glendale and Scottsdale United Fund, Mesa United Fund, Tempe United Fund and Chandler United Fund; and said plan with the proposed amendment having been submitted to the Securities and Exchange Commission for its examination and report pursuant to the order of this Court; and the said hearing having been adjourned until March 11, 1969; and the Securities and Exchange Commission having filed its memorandum on the said plan, and a further hearing thereon having been held on the 11th day of March, 1969;

NOW, THEREFORE, upon the plan for the reorganization of Maryvale Community Hospital, Inc., said debtor, prepared and filed by Frank J. Dunning, trustee of said debtor, and the amendment thereto proposed by Dr. Theodor Bratrud; and after considering the memorandum of the Securities and Exchange Commission and the objections presented by the various parties, and all the proceedings had before me at the said hearings, and the Court being of the opinion that said plan, as amended, and its proposed distribution to the bondholders of all the proceeds of the sale to Good Samaritan Hospital, which includes the amount received from the settlement of the Roberts litigation, complies with the provisions of Section 216 of the Bankruptcy Act, and is fair and equitable and feasible, and the Court having filed its opinion thereon, dated Nov. 3, 1969; it is

ORDERED, that the said plan for the reorganization of Maryvale Community Hospital, Inc., the above named debtor, prepared and filed by Frank J. Dunning, trustee of said debtor, as amended by the amendment proposed by Dr. Theodor Bratrud, be, and it hereby is, approved; and it is further

ORDERED, that the objections filed to said plan of reorganization are overruled; and it is further

ORDERED, that December 31, 1969 be, and it hereby is, fixed as the last day of a time within which the creditors of the debtor affected by the said plan may accept the same in writing by mailing to the trustee, Frank J. Dunning, P. O. Box 3915, Phoenix, Arizona 85030, written acceptance of the plan for filing with the Court; said trustee shall act as the official teller and shall prepare and file with the Court a report reflecting the acceptance or rejection of the plan by the creditors; and it is further

ORDERED, that the summary of the said plan annexed hereto, marked Exhibit "A", and made a part hereof, be, and it hereby is, approved as the summary required by Section 175(1) of the Bankruptcy Act; and it is further

ORDERED, that within 30 days after the entry of this order, Frank J. Dunning, said trustee, shall transmit by mail to each creditor of the debtor who is affected by the said plan, at his address appearing upon the debtor's books and records, or otherwise known to him, a copy of the said amended plan together with a copy of the summary thereof herein approved, a copy of the opinion of the judge dated Nov. 3, 1969, a copy of the memorandum of the Securities and Exchange Commission, or a summary thereof approved by the Commission, a copy of this order, a copy of the notice hereto annexed, marked Exhibit "B", and made a part hereof, and an appropriate form for the acceptance of said amended plan; and it is further

ORDERED, that March 2, 1970, at 2:00 o'clock. P.M., in the Court Room No. 2, 7th Floor, United States Court House, 230 North First Avenue, Phoenix, Arizona, is fixed as the time and place for the determination of acceptances of the plan, and for hearing on confirmation of the plan under Section 179 of Chapter X of the Bankruptcy Act.

## APPENDIX A

## ARTICLE IV

## REDEMPTION PROVISIONS

Section 4.1. All or any part of the Series A, B, C, D, and E, bonds outstanding at any time or any other series created hereunder may be called for redemption and payment at any time within two years prior to their date of maturity, whether or not such time be an interest payment date, at the principal office of the Trustee, upon not less than thirty (30) days prior written notice given or waived as hereinafter provided, at their

principal amount, plus a premium based upon the time of redemption, as follows:

More than eighteen (18) months but not more than twenty-four (24) months prior to maturity___ 5%

More than twelve (12) months but not more than eighteen (18) months prior to maturity_____ 4%

More than six (6) months but not more than twelve (12) months prior to maturity_____ 3%

Not more than six (6) months prior to maturity_____ 0%

plus any unpaid interest payable for any period following the last interest paying date to the date of redemption as herein provided.

Section 4.1. [sic] All or any part of the Series F, G, H, I, J, K, L, M and N bonds outstanding at any time or any other series created hereunder may be called for redemption and payment at any time within five (5) years prior to their date of maturity, whether or not such time be an interest payment date, at the principal office of the Trustee, upon not less than thirty (30) days prior written notice given or waived as hereinafter provided, at their principal amount, plus a premium based upon the time of redemption, as follows:

More than twenty-four (24) months but not more than sixty (60) months prior to maturity___ 10%

More than eighteen (18) months but not more than twenty-four (24) months prior to maturity___ 5%

More than twelve (12) months but not more than eighteen (18) months prior to maturity_____ 4%

More than six (6) months but not more than twelve (12) months prior to maturity_____ 3%

Not more than six (6) months prior to maturity_____ 0%

plus any unpaid interest payable for any period following the last interest paying date to the date of redemption as herein provided.

## ARTICLE VI

## DEFAULTS AND REMEDIES

Section 6.1. If one or more of the following events (herein termed "events of default") shall have occurred:

(1) if default shall be made in the payment of any installments of interest on any of the bonds when and as the same shall become due and payable and any such default shall continue for a period of ten (10) days; or

\* \* \* \* \* \*

(3) if default shall be made in the payment of the principal or premium on any bond when and as the same shall become due and payable, whether at its stated maturity, by call for redemption, by declaration or otherwise; or

(4) if the Corporation shall fail to observe or perform any other covenant, condition, agreement or condition of the bonds or of this Indenture, express or implied, and if written notice of such failure shall be given to the Corporation by the Trustee and such failure shall continue for a period of sixty (60) days after the giving of such notice, or forthwith upon such notice if the Corporation shall waive such lapse of time, or, if in the opinion of the Trustee, evidenced by written notice to the Corporation, the continuance of such default would be likely to cause the loss to the Corporation of any substantial portion of its property needed to maintain and operate its business or property; or

(5) if the Corporation \* \* \* [is placed] under the corporate reorganization provisions of the National Bankruptcy Act, as now or hereafter amended, \* \* \* or

(6) if any order, judgment or decree shall be entered by any court of competent jurisdiction \* \* \* appointing a receiver or trustee of the Corporation or of the whole or any substantial part of the mortgaged property, and such order shall not have been vacated, set aside or stayed, or the receiver or trustee so appointed shall not have been removed or discharged, as the case may be, within sixty (60) days thereafter \* \* \* or

(7) if a petition against the Corporation in proceedings under the corporate reorganization provisions of the National Bankruptcy Act, as now or hereafter mentioned, shall be approved by any court of competent jurisdiction and such approval shall not be withdrawn and the proceeding dismissed within sixty (60) days thereafter, or if, under the provisions of any other now existing or future bankruptcy or other law providing for the reorganization, dissolution, liquidation or winding up of corporations on ground if [sic] insolvency, any court of competent jurisdiction shall assume jurisdiction, custody or control of the Corporation \* \* \* and such jurisdiction, custody or control shall not be relinquished or terminated within sixty (60) days thereafter \* \* \*.

Section 6.2. Upon the occurrence of any such event of default the Corporation shall, forthwith upon the demand of the Trustee, duly perform each then applicable covenant and provision hereof and of the bonds, and shall pay to the Trustee, as trustee of an express trust, all sums then or during any default become due under any provision hereof or of the bonds, with interest at the rate of eight percent (8%) per annum on overdue interest and principal, together with the costs and expenses of collection, including attorneys' fees, and of all action and proceedings taken by the Trustee, together with all other amounts that may be due and payable by the Corporation under any provision of this Indenture

\* \* \* \* \* \*

Section 6.4. Upon any sale of all or substantially all the mortgaged property, whether pursuant to the Trustee's power of sale or pursuant to any judicial proceedings, all bonds then outstanding shall, without declaration by the Trustee, forthwith become due and payable \* \*

## APPENDIX B

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I

### BACKGROUND STATEMENT

A. *Legal Proceedings*

1. On July 31, 1963, Union Title Company, Indenture Trustee under Indenture of Mortgage and Deed of Trust securing the issuance of the 8% First Mortgage Bonds issued by the Debtor, Maryvale Community Hospital, Inc., filed an action in the Superior Court for the State of Arizona, County of Maricopa, as Indenture Trustee, against the Debtor, Maryvale Community Hospital, Inc., for an accounting and appointment of receivers.

2. The Superior Court, on July 31, 1963, appointed Dr. Duke R. Gaskins and Frederick Foster as co-receivers of the Debtor.

3. August 1, 1963, Harry E. Gissing, Mary T. Donohue, Helen Gissing, John L. Roberts, and Hazel Roberts, all bondholders of the Debtor, filed in this court an ORIGINAL PETITION OF CREDITORS HOLDING BONDS ISSUED BY DEBTOR CORPORATION for the corporate reorganization of the Debtor pursuant to Sections 126, 130 and 131 of Chapter X of the Bankruptcy Act.

4. A subpoena was issued August 1, 1963, to the Maryvale Community Hospital, Inc., by and through its statutory agent, Dr. William McGee and to Dr. Duke R. Gaskins and Frederick Foster, co-receivers, requiring them to appear and plead to said petition for reorganization on or before August 19, 1963.

5. On August 19, 1963, Union Title Company, Indenture Trustee, filed an APPEARANCE, MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT on the ground that the Court was without jurisdiction to approve the creditors' petition. The co-receivers in the State Court action filed a similar pleading on the same day.

6. The Debtor did not appear or plead to the creditors' petition within the time specified in the subpoena.

7. The Plaintiffs and Defendant in the State Court receivership proceeding stipulated to a dismissal of that proceeding with the approval of the State Court on November 26, 1963.

8. On November 26, 1963, petitioning creditors sought and obtained the appointment by this Court of a Chapter X receiver. Frederick Foster was appointed Receiver to take possession of and operate the property and business of the Debtor.

B. *Debtor's Answer*

1. On December 16, 1963, the Debtor, Maryvale Community Hospital, Inc., appeared and filed an ANSWER CONTROVERTING ORIGINAL PETITION OF BONDHOLDERS.

2. The Debtor's answer challenged the Court's jurisdiction to proceed.

C. *Hearing on Chapter X Petition*

Hearing was held on December 16, 1963, on the petitioning creditors' Chapter X petition at which evidence was taken, arguments of counsel presented and the matter was submitted to the Court.

### II

### THE DEBTOR CORPORATION

A. *Organization*

1. Maryvale Community Hospital, Inc., Debtor, is an Arizona corporation incorporated under the Arizona Non-Profit Corporation Law on December 2, 1959, as a nonstock membership corporation. It operates a 156 bed general medical hospital located in the Community of Maryvale, Phoenix, Arizona.

2. The original incorporators of the Debtor were William E. McGee, Harmon E. Keyes, and Eugene T. Keech.

3. The charter of the Debtor provided for (a) memberships to be extended to those persons contributing to or rendering service to the hospital; (b) for no less than three members of a board of

directors; and (c) for annual membership meetings with the election of directors by the members annually.

4. Debtor was organized and promoted by a hospital promotion group, Universal Development Company, Inc., an Arizona corporation. This corporation was created under the Profit Corporation Law of the State of Arizona on July 14, 1959, bearing the name of Maryvale Community Hospital, Inc. On December 2, 1959, the name of this corporation was then changed to Universal Development Company, Inc. Its president was Charles R. Kendrick and its secretary was W. B. Cooper.

5. On December 11, 1959, the Debtor held an organizational meeting of the incorporators. At this meeting (a) the two kinds of memberships were designated; (2) a contract was approved with Universal Development Company, Inc. to build the hospital; and (c) the sale of $2,750,000.00 in First Mortgage 8% Bonds was authorized with the Lane Title and Trust Company as Indenture Trustee, with the Debtor as first beneficiary and Universal Development Company, Inc. as second beneficiary.

6. The Universal Development Company, Inc. purchased the hospital site of the Debtor from John L. Long or one of his companies and later resold the land to the Debtor corporation. Universal Development Company, Inc. also handled all arrangements for the sale of the 8% First Mortgage Bonds to the members of the public to finance the construction and equipping of the hospital.

7. No membership meetings have ever been called or held nor have the members elected directors all as provided for in the charter of the Debtor.

8. The Debtor opened to receive patients in September, 1961.

B. *Financing*

1. The Debtor was financed through the sale of First Mortgage Bonds to the members of the public, bearing interest at the rate of 8% per annum, and secured by an Indenture of Mortgage and Deed of Trust and Supplement thereto dated January 6, 1960, and June 19, 1961, respectively.

2. Lane Title and Trust Company, and its successors, Financial Corporation of Arizona and Union Title Company, was designated the Indenture Trustee.

3. The 8% First Mortgage Bonds authorized to be issued under the Indenture of Mortgage and Deed of Trust by the Debtor were to be in alphabetical Series "A" through "N" and in such other appropriately designated series as the board of directors of the corporation shall, from time to time, determine. Series "A" through "M" were each limited to $200,000 in aggregate principal amount and Series "N" was limited to $150,000 in aggregate principal amount. The total aggregate principal amount of these series amounted to $2,750,000.

4. Additional Series "O" and "P" were subsequently authorized and issued by the Debtor corporation pursuant to the Supplement Indenture of Mortgage and Deed of Trust dated June 19, 1961, and subject to the same terms and conditions of the original Indenture. The Series "O" and "P" were each limited to $250,000 in aggregate principal amount, for an authorized total of $500,000.

5. The total principal amount of bonds issued and outstanding as of November 1, 1963, was $3,238,700.

6. Each series of bonds bears interest at the rate of 8% per annum, payable semi-annually on June 1 and December 1 of each year. The only interest payments on the bonds made directly to the bondholders by the Indenture Trustee were $6,696.28 on June 1, 1960; $30,355.53 on December 1, 1960; $64,848.92 on June 1, 1961; $109,464.36 on December 1, 1961; and $32,382.00 on May 17, 1963, for an aggregate amount of $243,745.09. $30,367.36 was disbursed to the Debtor by the Indenture Trustee for the additional payment of the December 1, 1960, interest on the bonds issued and outstanding.

7. Total interest arrearage as of November 1, 1963 was $440,455.80.

8. The 8% First Mortgage Bonds mature serially on July 1 of each year commencing with Series "A" on July 1, 1965, and alphabetically each year thereafter. A fixed sinking fund is provided for in Article V, Section 5.1 of the Indenture of Mortgage and Deed of Trust for the retirement of the bonds and the payment of interest. The Debtor was obligated to pay into such fund the sum of $30,000 cash, monthly, for principal and interest, the first payment to commence on January 1, 1961. For the period January 1, 1961, to November 30, 1963, a period of 35 months, the sum of $1,050,000 should have been paid into the fixed sinking fund for the payment of interest and for the retirement of the Series "A" through "N" bonds.

9. No payments have ever been made into the sinking fund other than that used for the interest payments set forth in Finding Number 6 hereof.

10. All of the 8% First Mortgage Bonds are in default.

11. All monies received by the Debtor for the purchase of the site, the construction and equipping of the hospital and for the initial working capital flowed from the sale of the 8% First Mortgage Bonds to the members of the public.

C. *Management*

1. The first board of directors of the Debtor and the officers were William E. McGee, president and director; Harmon E. Keyes, vice-president and director; and Eugene T. Keech, secretary-treasurer and director.

2. The board of directors of the Debtor and its president as of December 16, 1963, were William E. McGee, president and director; Charles Ince, director; John F. Long, Chairman of the board and director; Walter Gorczynski, director; Aaron Kinney, director; and John J. Kennedy, director.

III

CREDITORS' CHAPTER X PETITION

A. The five (5) petitioning creditors are creditors of the Debtor holding valid claims, the aggregate principal amount of which exceeds $5,000, to wit, $34,200 plus interest, which claims are liquidated as to amount and not contingent as to liability.

B. The Debtor has its principal place of business within the territorial jurisdiction of the Court.

C. The Debtor is unable to pay its debts as they mature.

D. On the date of the filing of the creditors' Chapter X petition, August 1, 1963, the Indenture Trustee under Indenture of Mortgage and Deed of Trust securing the issuance of 8% First Mortgage Bonds, had obtained the appointment of State Court Co-receivers in an action entitled "UNION TITLE COMPANY, an Arizona corporation, and FINANCIAL CORPORATION OF ARIZONA, an Arizona corporation, PLAINTIFFS v. MARYVALE COMMUNITY HOSPITAL, INC., an Arizona corporation, DEFENDANT" in the Superior Court of the State of Arizona, County of Maricopa, #151970. Pursuant to such appointment, the Co-receivers took possession and charge of all of the property of the Debtor.

E. On August 1, 1963, there was no other petition in any bankruptcy proceedings filed or pending by or against the Debtor corporation.

F. The creditors' petition is properly verified by the five (5) petitioning creditors.

IV

COURT'S JURISDICTION

A. Maryvale Community Hospital, Inc., Debtor, is a corporation which could become a bankrupt under the Bankruptcy Act and is within the meaning of the term "corporation" contained in Section 126

as that term is defined by Section 106(3) of Chapter X.

B. The creditors' petition is properly filed and complies with the requirements of Chapter X of the Bankruptcy Act.

C. The allegations of the creditors' petition comply with Sections 130 and 131 of Chapter X.

D. The creditors' petition was filed in good faith.

E. The Court has jurisdiction to approve the creditors' petition.

The petition praying for the corporate reorganization of the Debtor, Maryvale Community Hospital, Inc., under the provisions of Chapter X of the Bankruptcy Act should be approved.

### Exhibit "A"

### ARTICLE II
### SUMMARY OF PROPOSED PLAN FOR DISTRIBUTION

1. The Court has determined that there is only one class of creditors, to wit: The Bondholders.

2. According to the Trustee's records and those of the Indenture Trustee, there are outstanding and issued bonds in the total principal amount of Three Million, Two Hundred Thirty-Six Thousand Nine Hundred Dollars ($3,236,900.00). These are distributed among one thousand three hundred fifty-nine (1,359) Bondholders scattered throughout the United States.

3. The Indenture Trustee has testified that there was due the Bondholders as of October 22, 1968, and pursuant to the terms of the Indenture, a total of Five Million Fifty-Four Thousand Seven Hundred Thirty and 42/100 ($5,054,730.42) Dollars, which includes prepayment premiums and regular and defaulted interest to the date of sale.

4. In addition to this, the Bondholders should be entitled to One Hundred Thousand Two Hundred Dollars and 00/100 ($100,200.00) Dollars recovered by the Roberts civil suit, thus making the total due Bondholders equal to Five Million One Hundred Fifty-Four Thousand Nine Hundred Thirty and 42/100 ($5,-154,930.42) Dollars.

5. The total amount of all Debtor's assets, which include the proceeds of the sale to Good Samaritan Hospital and the other assets that have been reduced to cash, was, as of October 23, 1968, Five Million One Hundred and Twenty-three Thousand, Six Hundred and Forty-nine Dollars and Thirty-three Cents ($5,123,-649.33).

6. Your Trustee has, pursuant to this Court's order of October 23, 1968, disbursed to the Bondholders one hundred and twenty-five per cent (125%) of the principal value of their bonds. This disbursement is not complete as all bonds have not been delivered to the Indenture Trustee pursuant to the Court's order of August 12, 1968.

7. At this date your Trustee holds the following sums to be disbursed pursuant to this plan:

(a) Undistributed interest payments (due Bondholders whose address is unknown) from interest payments authorized prior to October 23, 1968, $8,643.00.

(b) Undistributed portion of the one hundred and twenty-five per cent (125%) payment authorized by this Court's order of October 23, 1968 (due Bondholders whose addresses are unknown or who have failed to deliver bonds to Indenture Trustee), $113,250.00.

(c) Remaining undistributed proceeds of sale to Good Samaritan Hospital and other assets, which are subject to final distribution after the fee hearings and Sections 196 and 197 hearings on bond claims scheduled for January 9, 1969, $1,093,094.78 (note the sum described above includes interest earned since the proceeds of the Good Samaritan sale were paid to the Trustee).

8. After the hearing on January 9, 1969, and as soon as the Court has made its order determining and authorizing payment of administrative compensation and costs, your Trustee will make such payments out of fund "c" above described (paragraph 7(c).

9. Your Trustee will estimate and reserve from fund "c" above, an additional amount as approved by the Court, to include the costs of administration of the estate which cannot be terminated until the expiration of five (5) years, unless all Bondholders and claimants have been located and their claims, as approved by the Court, paid.

10. The plan will provide for the disposition of any funds remaining after the expiration of five (5) years by payment of said funds over to the purchaser (Good Samaritan Hospital), or otherwise, as the Court might direct.

11. The remaining money in fund "c" will be disbursed in accordance with the Court's determination of the amount due each Bondholder in accordance with the terms of the Indenture and otherwise.

12. The several series of bonds issued provide for different maturity dates and prepayment premiums. Also, some bonds have received less interest payments than others.

13. The Indenture Trustee, at the hearing on January 9, 1969, is expected to present to the Court the details of the computations and the schedules showing the amounts due on each bond series. This will establish the amount due each Bondholder for the bonds he holds.

14. The Trustee will then make a determination, subject to the Court's approval, of how much is due each series based on its date of issue and the penalties due under the Indenture for that particular series.

15. By way of example:

Certain series bonds matured in 1965, 1966, 1967 and 1968.

These series are subject to default penalties and interest on interest. Those maturing thereafter are subject to default penalties for non-payment of interest and prepayment premium.

16. Let us assume there are hypothetical bonds of Series "X", "Y" and "Z" (there are none of such).

17. Assume that the Court has found that Series "X" bonds are entitled to one hundred and forty-five per cent (145%) of its principal, Series "Y" to one hundred and forty-eight per cent (148%), and Series "Z" to one hunderd and fifty per cent (150%).

18. Assume that it has been ascertained that the assets and proceeds for distribution amount to Five Million One Hundred and Twenty-three Thousand Dollars ($5,123,000.00), and that administrative costs allowed and heretofore unpaid, plus reserve for final costs, amount to Two Hundred and Fifty Thousand Dollars ($250,000.00), so that the total (including the 125% heretofore distributed) to be distributed to Bondholders is only Four Million Eight Hundred and Seventy-three Thousand Dollars ($4,873,000.-00) and is only 94.9% of the total due them.

19. The final distribution in our hypothetical case, to the bonds of "X", "Y" and "Z" Series bonds, would amount to 94.9% of the full amount due.

20. In the "X" Series bonds there would be for each $100.00 of principal, $145.00 due, if paid in full, the sum of $137.66, being 94.9% of $145.00. In the same manner "Y" Series would get 94.9% of $148.00 or $140.45, and "Z" Series would get 94.9% of $150.00 or $142.35.

21. Not all Bondholders have been located nor have all Bondholders turned in their bonds to the Trustee, and the sums due these persons (see Article II, paragraph 7(b) and (c), must be held for a period of no less than five (5) years, during which time the Trustee must make every reasonable effort to locate these Bondholders and advise them of their rights. If after five (5) years, these persons cannot be found, the Trustee will, in this case, turn the money over to Good Samaritan Hospital, or as the Court might otherwise direct (see Sections 204 and 205 of Chapter X).

22. The Trustee will reserve out of the distribution to the Bondholders, or out of the funds held for the Bondholders who cannot be found, such sums as the Court may determine to be held for

payment of continuing administrative costs and compensation to complete the closing of the estate.

23. Your Trustee is satisfied that this plan is fair, equitable and feasible and hereby represents to the Court that this is true to the best of his information and belief.

Exhibit "B"

NOTICE TRANSMITTED UNDER SECTION 175 OF THE BANKRUPTCY ACT

TO ALL BONDHOLDERS AND OTHER PARTIES IN INTEREST:

NOTICE IS HEREBY GIVEN THAT

1. On Nov. 3, 1969, the above entitled Court approved an amended plan for the reorganization of Maryvale Community Hospital, Inc., the above named debtor, prepared and filed by Frank J. Dunning, trustee of said debtor.

2. In accordance with the said order of Nov. 3, 1969, there is transmitted herewith:

(a) A copy of the said amended plan, together with a copy of the summary thereof approved by the Judge;

(b) A copy of the Judge's opinion approving the plan;

(c) A copy of the memorandum of the Securities and Exchange Commission dated February 19, 1969;

(d) A copy of the order approving the plan; and

(e) An appropriate form for acceptance of said plan.

3. Acceptances may be filed with the Court in writing by the bondholders affected by the plan *on or before* December 31, 1969, by mailing a written acceptance to Frank J. Dunning, P. O. Box 3915, Phoenix, Arizona 85030. Any acceptance timely received by the trustee will be filed by him with the Court.

4. An appropriate form of acceptance of the said amended plan is enclosed for the convenience of the bondholders, if they desire to accept the said plan.

5. Acceptances will be effective only as to bondholders and other parties affected by the plan whose proofs of claims have been filed herein and allowed by the Court.

6. Monday, the 2nd day of March, 1970, at 2:00 o'clock, P M., in the Court Room of the Honorable C. A. Muecke, United States District Judge, Court Room No. 2, 7th Floor, United States Court House, 230 North First Avenue, Phoenix, Arizona, has been fixed as the time and place to consider the confirmation of the said plan of reorganization, and such objections as may be made to its confirmation in accordance with the provisions of Section 179 of Chapter X of the Bankruptcy Act.

NOTICE IS FURTHER GIVEN THAT:

Said hearing on confirmation may be adjourned from time to time without further notice to bondholders and other parties in interest, other than the announcement of the adjourned date or dates in open Court at said hearing.

BY ORDER OF THE COURT

Dated this 3rd day of November, 1969, at Phoenix, Arizona.

FRANK J. DUNNING
Trustee of the estate of Maryvale Community Hospital, Inc.